517 U.S. 830 (1996)
EXXON CO., U. S. A., et al.
v.
SOFEC, INC., et al.
No. 95-129.
United States Supreme Court.
Argued March 19, 1996.
Decided June 10, 1996.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
*832 *832 Thomas, J., delivered the opinion for a unanimous Court.
Shirley M. Hufstedler argued the cause and filed briefs for petitioners.
George Playdon argued the cause for respondents. With him on the brief for respondents Pacific Resources, Inc., et al. were James W. McCartney, Theodore G. Dimitry, Eugene J. Silva, and Richard H. Page. Kenneth W. Starr, Edward W. Warren, Richard A. Cordray, Randall K. Schmitt, David W. Proudfoot, and John R. Lacy filed a brief for respondents Sofec, Inc., et al.[*]
Justice Thomas, delivered the opinion of the Court.
In United States v. Reliable Transfer Co., 421 U. S. 397 (1975), we abandoned the "divided damages" rule previously applied to claims in admiralty for property damages, and adopted the comparative fault principle for allocating damages among parties responsible for an injury. In this case we affirm that the requirement of legal or "proximate" causation, and the related "superseding cause" doctrine, apply in admiralty notwithstanding our adoption of the comparative fault principle.

I
This case arises from the stranding of a tanker, the Exxon Houston , several hours after it broke away from a Single Point Mooring System (SPM) owned and operated by the HIRI respondents and manufactured by respondent Sofec, Inc.[1] The Houston was engaged in delivering oil into HIRI's *833 pipeline through two floating hoses, pursuant to a contract between Exxon and respondent PRII, when a heavy storm broke the chafe chain linking the vessel to the SPM. As the vessel drifted, the oil hoses broke away from the SPM. The parting of the second hose at approximately 1728 nautical time was designated below as the "breakout." The hoses were bolted to the ship, and a portion of the second hose remained attached to the ship. So long as the hose was attached to and trailing from the ship, it threatened to foul the ship's propeller, and consequently the ship's ability to maneuver was restricted.
During the 2 hours and 41 minutes following the breakout, the captain of the Houston , Captain Coyne, took the ship through a series of maneuvers described in some detail in the District Court's findings of fact. The District Court found that by 1803, a small assist vessel, the Nene, was able to get control of the end of the hose so that it was no longer a threat to the Houston . See 54 F. 3d 570, 572 (CA9 1995). Between 1803 and 1830, Captain Coyne maneuvered the Houston out to sea and away from shallow water. The District Court, and on appeal, a panel of the Court of Appeals for the Ninth Circuit, found that by 1830, the Houston had successfully avoided the peril resulting from the breakout. App. to Pet. for Cert. 65; 54 F. 3d, at 578-579. The ship had "reached a safe position," App. to Pet. for Cert. 64, and was "heading out to sea and in no further danger of stranding," id. , at 65; 54 F. 3d, at 578.
Many of Captain Coyne's actions after 1830 were negligent, according to the courts below. Most significant was his failure to have someone plot the ship's position between 1830 and 2004, a period during which the crews of the Houston and the Nene were working to disconnect the hose from the Houston . Without knowing his position, Captain Coyne *834 was unable to make effective use of a navigational chart to check for hazards. The courts found that this failure to plot fixes of the ship's position was grossly and extraordinarily negligent. App. to Pet. for Cert. 61; 54 F. 3d, at 578. The District Court found that "Captain Coyne's decisions were made calmly, deliberately and without the pressure of an imminent peril." App. to Pet. for Cert. 60. His failure to plot fixes after 1830 "was entirely independent of the fact of breakout; he voluntarily decided not to plot fixes in a situation where he was able to plot fixes." Id., at 64.
At 1956, Captain Coyne initiated a final turn toward the shore. Because he had not plotted the ship's position, Captain Coyne was unaware of its position until he ordered another crew member to plot the fix at 2004. Upon seeing the fix on the chart, the captain apparently realized that the ship was headed for a reef. Captain Coyne's ensuing efforts to avoid the reef came too late, and moments later the ship ran aground, resulting in its constructive total loss. The District Court found that Captain Coyne's decision to make this final turn "was not foreseeable." Id., at 65.
Exxon filed a complaint in admiralty against the HIRI respondents and respondent Sofec for, inter alia, the loss of its ship and cargo. The complaint contained claims for breach of warranty, strict products liability, and negligence. HIRI filed a complaint against several third-party respondents, who had manufactured and supplied the chafe chain that held the tanker to the SPM.
Before trial, respondents suggested that Captain Coyne's conduct was the superseding and sole proximate cause of the loss of the ship, and they moved to bifurcate the trial. Respondents and the third-party respondents disputed among themselves the cause of the breakout, and they apparently sought bifurcation of the trial to avoid lengthy proceedings to resolve those factual disputes prior to a determination whether Captain Coyne's conduct was the superseding cause *835 of Exxon's injury. The District Court granted the motion, limiting the first phase of the trial to the issue of proximate causation with respect to actions taken after the breakout, and leaving the issue of causation of the breakout itself for the second phase.
Following a 3-week bench trial in admiralty, the District Court found that Captain Coyne's (and by imputation, Exxon's) extraordinary negligence was the superseding and sole proximate cause of the Houston' s grounding. Id., at 63. The court entered final judgment against Exxon with respect to the loss of the Houston, and Exxon appealed.
The Ninth Circuit held that the District Court's findings "that Captain Coyne had ample time, as well as opportunity and available manpower, to take precautions which would have eliminated the risk of grounding, and that his failure to do so amounted to extraordinary negligence, superseding any negligence of the defendants with regard to the breakout or provision of safe berth after the breakout," were "well supported by the record," and not clearly erroneous. 54 F. 3d, at 579. The court rejected Exxon's contention that the captain's actions were foreseeable reactions to the breakout; rather, it noted, Captain Coyne himself had explained that he did not plot fixes "because he felt it was unnecessary to do so." Id. , at 578.
Relying upon Circuit precedent, the court rejected Exxon's legal argument that the doctrines of proximate causation and superseding cause were no longer applicable in admiralty in light of this Court's decision in Reliable Transfer. "[A]n intervening force supersedes prior negligence" and thus breaks the chain of proximate causation required to impose liability on the original actor, the court held, "where the subsequent actor's negligence was `extraordinary' (defined as `neither normal nor reasonably foreseeable')." 54 F. 3d, at 574. The court also rejected Exxon's argument that the District Court erred in rendering judgment against Exxon *836 on its breach of warranty claims. "Where, as here, the district court finds the injured party to be the superseding or sole proximate cause of the damage complained of, it cannot recover from a party whose actions or omissions are deemed to be causes in fact, but not legal causes of the damage." Id. , at 576. Finally, the court held that under the circumstances of the case, the District Court's bifurcation of the trial was not an abuse of discretion. We granted certiorari. 516 U. S. 983 (1995).

II
Exxon makes four arguments for the reversal of the judgment below: (1) that the superseding cause doctrine does not or should not apply in admiralty; (2) that respondents' breaches of warranty were causes in fact of the loss of the Houston and hence respondents should be liable for that loss; (3) that the lower courts' finding that Captain Coyne's extraordinary negligence was the sole proximate cause of the loss of the Houston was in error; and (4) that the District Court abused its discretion and deprived Exxon of due process in bifurcating the issue of proximate causation from the other issues.

A
Exxon's primary argument is that the proximate causation requirement, and the related superseding cause doctrine, are not or should not be applicable in admiralty. In particular, Exxon asserts that the lower courts' refusal to allocate any share of damages to parties whose fault was a cause in fact of Exxon's injury conflicts with our decision in Reliable Transfer. 
We disagree. In Reliable Transfer, we discarded a longstanding rule that property damages in admiralty cases are to be divided equally between those liable for injury, "whatever the relative degree of their fault may have been," 421 U. S., at 397, and adopted the comparative fault principle in *837 its stead.[2] The proximate causation requirement was not before us in Reliable Transfer, and we did not suggest that the requirement was inapplicable in admiralty. (Nor, for that matter, did we consider whether the injury had been proximately caused by the defendant in that case.)
There is nothing internally inconsistent in a system that apportions damages based upon comparative fault only among tortfeasors whose actions were proximate causes of an injury. Nor is there any repugnancy between the superseding cause doctrine, which is one facet of the proximate causation requirement, and a comparative fault method of allocating damages. As Professor Schoenbaum has said:
"The doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable. It is properly applied in admiralty cases.
". . . [T]he superseding cause doctrine can be reconciled with comparative negligence. Superseding cause operates to cut off the liability of an admittedly negligent defendant, and there is properly no apportionment of comparative fault where there is an absence of proximate *838 causation." 1 T. Schoenbaum, Admiralty and Maritime Law  5-3, pp. 165-166 (2d ed. 1994).
Indeed, the HIRI respondents assert that of the 46 States that have adopted a comparative fault system, at least 44 continue to recognize and apply the superseding cause doctrine. Brief for HIRI Respondents 28, and n. 31; id. , at App. A (listing state-court decisions). Exxon does not take issue with this assertion and concedes that it is not aware of any state decision that holds otherwise. Tr. of Oral Arg. 10.
Exxon also argues that we should in any event eschew in the admiralty context the "confusing maze of common-law proximate cause concepts"; a system in which damages are allocated based upon the degree of comparative fault of any party whose act was a cause in fact of injury is "fairer and simpler," it says. Reply Brief for Petitioners 2. It is true that commentators have often lamented the degree of disagreement regarding the principles of proximate causation and confusion in the doctrine's application, see, e. g., Keeton 263, but it is also true that proximate causation principles are generally thought to be a necessary limitation on liability, see, e. g., id. , at 264, 293, 294, 312. Indeed, the system Exxon apparently proposes either would let proximate causation principles, with all of their complexity, creep back in as one factor in the "comparative fault" analysis itself, see n. 2, supra, or would produce extreme results. "In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond." Keeton 264. Nevertheless,
"the careless actor will [not] always be held for all damages for which the forces that he risked were a cause in fact. Somewhere a point will be reached when courts will agree that the link has become too tenuousÔÇöthat what is claimed to be consequence is only fortuity. Thus, if the [negligent] destruction of the Michigan Avenue Bridge had delayed the arrival of a doctor, with consequent *839 loss of a patient's life, few judges would impose liability." Petition of Kinsman Transit Co., 338 F. 2d 708, 725 (CA2 1964), quoted in 1 Schoenbaum, supra,  5-3, at 164.
In ruling upon whether a defendant's blameworthy act was sufficiently related to the resulting harm to warrant imposing liability for that harm on the defendant, courts sitting in admiralty may draw guidance from, inter alia, the extensive body of state law applying proximate causation requirements and from treatises and other scholarly sources. See Keeton 279 ("`The best use that can be made of the authorities on proximate cause is merely to furnish illustrations of situations which judicious men upon careful consideration have adjudged to be on one side of the line or the other' ") (quoting 1 T. Street, Foundations of Legal Liability 110 (1906)).

B
Exxon's argument that the District Court erred in rendering judgment against Exxon on its breach of warranty claims fares no better. Exxon implicitly argues that because the respondents breached various contractual warranties, they were "best situated" to prevent the loss of the Houston; and Exxon invokes a passage from Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U. S. 315 (1964). In Italia Societa, we held that a stevedore breaches its implied warranty of workmanlike service to a shipowner when the stevedore nonnegligently supplies defective equipment that injures one of its employees during stevedoring operations. That case does not purport to deal with the proximate causation limitation for damages on a warranty claim and is not relevant to the question presented here.
We agree with the Ninth Circuit that where the injured party is the sole proximate cause of the damage complained of, that party cannot recover in contract from a party whose breach of warranty is found to be a mere cause in fact of the damage. Although the principles of legal causation sometimes *840 receive labels in contract analysis different from the "proximate causation" label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well. Indeed, the requirement of foreseeability may be more stringent in the context of contract liability than it is in the context of tort liability. See East River S. S. Corp. v. Transamerica Delaval Inc., 476 U. S. 858, 874-875 (1986); Restatement (Second) of Contracts  351 and Comment a, pp. 135-136 (1979); 11 W. Jaeger, Williston on Contracts  1344, pp. 227-228 (3d ed. 1968); 5 A. Corbin, Corbin on Contracts  1008, pp. 75-76 (1964); id.,  1019, at 113-116; cf. 3 E. Farnsworth, Contracts  12.14, pp. 241-243 (1990) (Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854), "impose[s] a more severe limitation on the recovery of damages for breach of contract than that applicable to actions in tort or for breach of warranty, in which substantial or proximate cause is the test"). The finding that Captain Coyne's extraordinary negligence was the sole proximate cause of Exxon's injury suffices to cut off respondents' liability for that injury on a contractual breach of warranty theory as well.

C
The legal question that we took this case to address is whether a plaintiff in admiralty that is the superseding and thus the sole proximate cause of its own injury can recover part of its damages from tortfeasors or contracting partners whose blameworthy actions or breaches were causes in fact of the plaintiff's injury. As we have held above, the answer is that it may not. Apparently anticipating that this legal issue would not likely be resolved in its favor, Exxon devotes a large portion of its briefs to arguing that the findings by the lower courts that Captain Coyne's extraordinary negligence was the sole proximate cause of Exxon's injury were in error. The issues of proximate causation and superseding cause involve application of law to fact, which is left to the *841 factfinder, subject to limited review. See, e. g., Milwaukee & St. Paul R. Co. v. Kellogg, 94 U. S. 469, 473-476 (1877); Keeton 320-321; 5 Corbin, supra,  998, at 22-23. "A court of law, such as this Court is, rather than a court for correction of errors in fact finding, cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error." Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U. S. 271, 275 (1949); see also Goodman v. Lukens Steel Co., 482 U. S. 656, 665 (1987); Reliable Transfer, 421 U. S., at 401, n. 2. Although Exxon identifies some tension in the various findings made by the courts below,[3] we nevertheless conclude that Exxon has not made an "obvious and exceptional showing of error" that would justify our reversal of the courts' ultimate African-American. If the Tarrant County and Collin County portions of the district were removed, the resulting district would have 557,218 people, of which 280,620 (or 50.36%) would be African-American. While the resulting district would not include the "zero deviation" necessary under Reynolds v. Sims, 377 U. S. 533 (1964), and its progeny, see n. 10, supra, the missing population could easily be acquired in majority-black census blocks adjacent to District 30's southern and eastern edge, thereby increasing the proportion of black population still further. Because the alleged racial goals of the district could be achieved more effectively by making the district more compact, I simply do not comprehend how the plurality can conclude that the effort to create a majority-minority district "predominated" over other, race-neutral goals. *1024 Intent 
Perhaps conscious that noncompact congressional districts are the rule rather than the exception in Texas, the plurality suggests, ante, at 960-961, 969-970, that the real key is the direct evidence, particularly in the form of Texas'  5 Voting Rights Act submissions and the person of then-State Senator Johnson, that the State expressed an intent to create these districts with a given "minimum percentage of the favored minority." 861 F. Supp., at 1309. Even if it were appropriate to rest this test of dominance on an examination of the subjective motivation of individual legislators,[23] or on *1025 testimony given in a legal proceeding designed to prove a conflicting conclusion,[24] this information does little more than confirm that the State believed it necessary to comply with the Voting Rights Act. Given its reasonable understanding of its legal responsibilities, see supra, at 1007, the legislature acted to ensure that its goal of creating a majority-black district in Dallas County was not undermined by the changes made to accommodate District 30 to other, race-neutral districting principles. As the plurality admits, see ante, at 958, the intent to create majority-minority districts does not in itself trigger strict scrutiny; these admissions prove nothing more than that. See also Shaw II, ante, at 930-932 (Stevens, J., dissenting).
Nonracial Factors: Community 
In an effort to provide a definitive explanation for the odd shape of the district, the State emphasized two factors: The *1026 presence of communities of interest tying together the populations of the district, and the role of incumbency protection. The District Court and the plurality improperly dismissed these considerations as ultimately irrelevant to the shape of the districts.
First, the appellants presented testimony that the districts were drawn to align with certain communities of interest, such as land use, family demographics, and transportation corridors. See 861 F. Supp., at 1322-1323. Although the District Court recognized that these community characteristics amounted to accurate descriptions of District 30, id., at 1323, it dismissed them as irrelevant to the districting process, concluding that there was no evidence that "the Legislature had these particular `communities of interest' in mind when drawing the boundaries of District 30." Ibid. The plurality concludes that appellants present no reason to displace that conclusion. Ante, at 966-967.
I do not understand why we should require such evidence ever to exist. It is entirely reasonable for the legislature to rely on the experience of its members when drawing particular boundaries rather than on clearly identifiable "evidence" presented by demographers and political scientists. Most of these representatives have been members of their communities for years. Unless the Court intends to interfere in state political processes even more than it has already expressed an intent to do, I presume that it does not intend to require States to create a comprehensive administrative record in support of their redistricting process. State legislators should be able to rely on their own experience, not only prepared reports. To the extent that the presence of obvious communities of interest among members of a district explicitly or implicitly guided the shape of District 30, it amounts to an entirely legitimate nonracial consideration.[25] *1027 Nonracial Factors: Incumbency 
The plurality admits that the appellants "present a . . . substantial case for their claim that incumbency protection rivaled race in determining the district's shape." Ante, at 967. Every individual who participated in the redistricting process knew that incumbency protection was a critical factor in producing the bizarre lines and, as the plurality points out, ante, at 963-964, even the District Court recognized that this nearly exclusive focus on the creation of "safe" districts for incumbents was intimately related to the bizarre shape of district lines throughout the State.
"[I]n Texas in 1991, many incumbent protection boundaries sabotaged traditional redistricting principles as they routinely divided counties, cities, neighborhoods, and regions. For the sake of maintaining or winning seats in the House of Representatives, Congressmen or would-be Congressmen shed hostile groups and potential opponents by fencing them out of their districts. The Legislature obligingly carved out districts of apparent supporters of incumbents, . . . and then added appendages to connect their residences to those districts. The final result seems not one in which the people select their representatives, but in which the representatives *1028 have selected the people." 861 F. Supp., at 1334 (citations and footnotes omitted).
See also id., at 1335, n. 43. Despite this overwhelming evidence that incumbency protection was the critical motivating factor in the creation of the bizarre Texas districts, the District Court reached the stunning conclusion that because the process was so "different in degree" from the "generalized, and legitimate, goal of incumbent and seniority protection" that this Court has previously recognized, it could not serve as a legitimate explanation for the bizarre boundaries of the congressional districts. Id., at 1334-1335. In dismissing incumbency protection once and for all, the District Court stated that "[i]ncumbent protection is a valid state interest only to the extent that it is not a pretext for unconstitutional racial gerrymandering." Id., at 1336.
It is difficult to know where to begin to attack the misperceptions reflected in these conclusions,[26] and the plurality's failure to do so seriously taints its evaluation of the relative importance of nonracial considerations in the creation of District 30. The initial problem, of course, is that under the Court's threshold test as set forth in Miller, one must consider the role of incumbency protection before determining whether there is an "unconstitutional racial gerrymander." And because the ultimate focus in these gerrymandering cases is the claim that race was the "dominant and controlling rationale in drawing [the] district lines," 515 U. S., at 913, a court must, in applying that test, consider a State's claim that a given race-neutral rationale controlled the creation of those lines. See id., at 916 ("Where [compactness, contiguity,] or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a State can `defeat a claim that a district has been *1029 gerrymandered on racial lines' "). Although a court may not like the State's explanation, that is no excuse for ignoring it.
If some independent bar prevented the use of that raceneutral criterion, then the District Court might be in a position to object to the State's use of it. We have, however, affirmed that a State has an interest in incumbency protection, see, e. g., ante, at 964-965 (opinion of O'Connor, J.); White v. Weiser, 412 U. S. 783, 791, 797 (1973), and also assured States that the Constitution does not require compactness, contiguity, or respect for political borders, see Shaw I, 509 U. S., at 647. While egregious political gerrymandering may not be particularly praiseworthy, see infra, at 1038ÔÇö 1040, it may nonetheless provide the race-neutral explanation necessary for a State to avoid strict scrutiny of the district lines where gerrymandering is the "dominant and controlling" explanation for the odd district shapes.[27]
The District Court's error had an apparently dispositive effect on its assessment of whether strict scrutiny should apply at all. Although aspects of our dispute with the plurality are "largely factual," ante, at 971, n., they arise not out of our disagreement with the District Court's credibility assessments, but out of that court's erroneous conclusion that the State's overwhelming reliance on this race-neutral factor was illegitimate and irrelevant to its evaluation of the factors involved in the shifting of this district's lines. A fair evaluation of the record made in light of appropriate legal standards requires a conclusion very different from the District Court's. By following the District Court down its misdirected path, the plurality itself goes astray. *1030 Race as a Proxy 
Faced with all this evidence that politics, not race, was the predominant factor shaping the district lines, the plurality ultimately makes little effort to contradict appellants' assertions that incumbency protection was far more important in the placement of District 30's lines than race. See ante, at 967-969. Instead, it adopts a fallback position based on an argument far removed from even the "analytically distinct" claim set forth in Shaw I, 509 U. S., at 652. In it, the plurality suggests that even if the predominant reason for the bizarre features of the majority-minority districts was incumbency protection, the State impermissibly used race as a proxy for determining the likely political affiliation of blocks of voters. See ante, at 968-971 (opinion of O'Connor, J.).
The effect of this process, in all likelihood, was relatively unimportant to the overall shape of the district. A comparison of the 1992 precinct results with a depiction of the proportion of black population in each census block reveals that Democratic-leaning precincts cover a far greater area than majority-black census blocks. Compare State's Exh. 9A with State's Exh. 45. One would expect the opposite effect if the single-minded goal of those drawing the districts was racial composition rather than political affiliation. At the very least, the maps suggest that the drawing of boundaries involves a demographic calculus far more complex than simple racial stereotyping.
Furthermore, to the extent that race served as a proxy at all, it did so merely as a means of "fine tuning" borders that were already in particular locations for primarily political reasons. This "fine tuning" through the use of race is, of course, little different from the kind of fine tuning that could have legitimately occurred around the edges of a compact majority-minority district.[28] I perceive no reason why a *1031 legitimate processÔÇöchoosing minority voters for inclusion in a majority-minority districtÔÇöshould become suspect once nonracial considerations force district lines away from its core.
Finally, I note that in most contexts racial classifications are invidious because they are irrational. For example, it is irrational to assume that a person is not qualified to vote or to serve as a juror simply because she has brown hair or brown skin. It is neither irrational, nor invidious, however, to assume that a black resident of a particular community is a Democrat if reliable statistical evidence discloses that 97% of the blacks in that community vote in Democratic primary elections. See Brief for United States 44. For that reason, the fact that the architects of the Texas plan sometimes appear to have used racial data as a proxy for making political judgments seems to me to be no more "unjustified," ante, at 969 (opinion of O'Connor, J.), and to have no more constitutional significance, than an assumption that wealthy suburbanites, whether black or white, are more likely to be Republicans *1032 than Communists.[29] Requiring the State to ignore the association between race and party affiliation would be no more logical, and potentially as harmful, as it would be to prohibit the Public Health Service from targeting AfricanAmerican communities in an effort to increase awareness regarding sickle-cell anemia.[30]
Despite all the efforts by the plurality and the District Court, then, the evidence demonstrates that race was not, in all likelihood, the "predominant" goal leading to the creation of District 30. The most reasonable interpretation of the record evidence instead demonstrates that political considerations were. In accord with the presumption against interference with a legislature's consideration of complex and competing factors, see n. 9, supra, I would conclude that the configuration of District 30 does not require strict scrutiny.

*1033 V
The Houston districts present a closer question on the application of strict scrutiny. There is evidence that many of the same race-neutral factors motivating the zigzags of District 30 were present at the creation (or recreation) of Districts 29 and 18. In contrast to District 30, however, there is also evidence that the interlocking shapes of the Houston districts were specifically, and almost exclusively, the result of an effort to create, out of largely integrated communities, both a majority-black and a majority-Hispanic district. For purposes of this opinion, then, I am willing to accept, arguendo, the plurality's conclusion that the Houston districts should be examined with strict scrutiny.[31] Even so, the plurality errs by concluding that these districts would fail that test.
The plurality begins with the perfectly obvious assumptions that a State has a compelling interest in complying with  2 of the Voting Rights Act and that Texas had a strong basis for believing that it would have violated that Act in 1991 if it did not create three new majority-minority districts.[32] The plurality goes on to conclude, however, that because the final shape of these districts is not coextensive with the community that would form the core of a  2 violation, these districts would not be "narrowly tailored" to further that state interest. Ante, at 979. I respectfully disagree.
Neither evidence nor insinuation suggests that the State in the redistricting process considered race for any reason *1034 other than as a means of accomplishing its compelling interest of creating majority-minority districts in accord with the Voting Rights Act. The goal was, by all accounts, achieved, for these districts would certainly avoid liability under  2 of the Voting Rights Act.[33] For reasons that continue to escape me, however, the plurality simply insists that the lack of compactness in the districts prevents them from being "narrowly tailored" solutions to the State's interests.
The plurality uses two premises to reach its conclusion that compactness is required to meet the "narrow tailoring" requirement: (i)  2 would not have been violated unless a reasonably compact majority-minority district could have been created; and (ii) nothing in  2 requires the creation of a noncompact district. I have no quarrel with either proposition, but each falls far short of mandating the conclusion that the plurality draws from it. While a State can be liable for a  2 violation only if it could have drawn a compact district and failed to do so, it does not follow that creating such a district is the only way to avoid a  2 violation. See generally Shaw II, ante, at 946-950 (Stevens, J., dissenting). The plurality admits that a State retains "a limited degree of leeway" in drawing a district to alleviate fears of  2 liability, ante, at 977, but if there is no independent constitutional duty to create compact districts in the first place, and the plurality suggests none, there is no reason why noncompact districts should not be a permissible method of avoiding violations of law. The fact that they might be unacceptable judicial remedies does not speak to the question whether they *1035 may be acceptable when adopted by a state legislature. Because these districts satisfy the State's compelling interest and do so in a manner that uses racial considerations only in a way reasonably designed to ensure such a satisfaction, I conclude that the districts are narrowly tailored.

VI
I cannot profess to know how the Court's developing jurisprudence of racial gerrymandering will alter the political and racial landscape in this NationÔÇöalthough it certainly will alter that landscape. As the Court's law in this area has developed, it has become ever more apparent to me that the Court's approach to these cases creates certain perverse incentives and (I presume) unanticipated effects that serve to highlight the essentially unknown territory into which it strides. Because I believe that the social and political risks created by the Court's decisions are not required by the Constitution, my first choice would be to avoid the preceding analysis altogether, and leave these considerations to the political branches of our Government.
The first unintended outcome of the legal reasoning in Shaw II and this case is the very result that those decisions seek to avoid: the predominance of race in the districting process, over all other principles of importance. Given the Court's unwillingness to recognize the role that race-neutral districting principles played in the creation of the bizarrely shaped districts in both this case and Shaw II, it now seems clear that the only way that a State can both create a majority-minority district and avoid a racial gerrymander is by drawing, "without much conscious thought," ante, at 967 (opinion of O'Connor, J.), and within the "limited degree of leeway" granted by the Court, ante, at 977, the precise compact district that a court would impose in a successful  2 challenge. See post, at 1066-1067 (Souter, J., dissenting). After the Court's decisions today, therefore, minority voters can make up a majority only in compact districts, whether *1036 intentionally or accidentally drawn, while white voters can be placed into districts as bizarre as the State desires.
The great irony, of course, is that by requiring the State to place the majority-minority district in a particular place and with a particular shape, the district may stand out as a stark, placid island in a sea of oddly shaped majority-white neighbors. See Karlan, Still Hazy After All These Years: Voting Rights in the Post-Shaw Era, 26 Cumberland L. Rev. 287, 309 (1995-1996). The inviolable sanctity of the  2eligible districts will signal in a manner more blatant than the most egregious of these racial gerrymanders that "a minority community sits here: Interfere with it not." The Court-imposed barriers limiting the shape of the district will interfere more directly with the ability of minority voters to participate in the political process than did the oddly shaped districts that the Court has struck down in recent cases. Unaffected by the new racial jurisprudence, majority-white communities will be able to participate in the districting process by requesting that they be placed into certain districts, divided between districts in an effort to maximize representation, or grouped with more distant communities that might nonetheless match their interests better than communities next door. By contrast, none of this political maneuvering will be permissible for majority-minority districts, thereby segregating and balkanizing them far more effectively than the districts at issue here, in which they were manipulated in the political process as easily as white voters. This result, it seems to me, involves "discrimination" in a far more concrete manner than did the odd shapes that so offended the Court's sensibilities in Miller, Shaw II, and these cases.
In light of this Court's recent work extolling the importance of state sovereignty in our federal scheme, cf. Seminole Tribe of Fla. v. Florida, ante, p. 44, I would have expected the Court's sensibilities to steer a course rather more deferential to the States than the one that it charts with its *1037 decisions today. As we have previously noted, "[e]lectoral districting is a most difficult subject for legislatures, and so the States must have discretion to exercise the political judgment necessary to balance competing interests." Miller, 515 U. S., at 915; see also post, at 1047-1048 (Souter, J., dissenting). The record in these cases evidences the "complex interplay of forces that enter a legislature's redistricting calculus," 515 U. S., at 915-916, and the Court's failure to respect those forces demonstrates even less respect for the legislative process than I would have expected after the decision in Miller. 
The results are not inconsequential. After Miller and today's decisions, States may find it extremely difficult to avoid litigation flowing from decennial redistricting. On one hand, States will risk violating the Voting Rights Act if they fail to create majority-minority districts. If they create those districts, however, they may open themselves to liability under Shaw and its progeny. See Miller, 515 U. S., at 949 (Ginsburg, J., dissenting). Perhaps States will simply avoid the problem by abandoning voluntary compliance with  2 of the Voting Rights Act altogether. See Shaw I, 509 U. S., at 672 (White, J., dissenting); post, at 1063-1064 (Souter, J., dissenting).[34] This result would not necessarily bring peace to redistricting, for there is no guarantee that districts created by court order to comply with  2 will be immune from attack under Shaw; in both Florida and Illinois, for instance, that very sort of schizophrenic second-guessing has already occurred. See King v. State Bd. of Elections, *1038 No. 95ÔÇöC-827, 1996 WL 130439 (ND Ill., Mar. 15, 1996); Johnson v. Mortham, 926 F. Supp. 1460 (ND Fla. 1996). Given the difficulty of reconciling these competing legal responsibilities, the political realities of redistricting, and the cost of ongoing litigation, some States may simply step out of the redistricting business altogether, citing either frustration or hopes of getting a federal court to resolve the issues definitively in a single proceeding. See, e. g., Johnson v. Miller, 922 F. Supp. 1556, 1559 (SD Ga. 1995) (after remand from Miller, Georgia Legislature abdicated its redistricting responsibilities to Federal District Court); post, at 1064 (Souter, J., dissenting) (noting the likely "vacuum of responsibility" at the state level).
Regardless of the route taken by the States, the Court has guaranteed that federal courts will have a handÔÇöand perhaps the only handÔÇöin the "abrasive task of drawing district lines." Wells v. Rockefeller, 394 U. S. 542, 553 (1969) (White, J., dissenting). Given the uniquely political nature of the redistricting process, I fear the impact this new role will have on the public's perception of the impartiality of the Federal Judiciary. I can only reiterate the Court's cautionary admonition, issued over two decades ago, that "[i]n fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor `intrude upon state policy any more than necessary.' " White v. Weiser, 412 U. S., at 795 (citing Whitcomb v. Chavis, 403 U. S. 124, 160 (1971)).
I do not wish to leave the impression that decisions of the Court from Shaw I to the present are focusing on entirely nonexistent problems. I merely believe that the Court has entirely misapprehended the nature of the harm that flows from this sort of gerrymandering. Rather than attach blameworthiness to a decision by the majority to share political power with the victims of past discriminatory practices, the Court's real concern should be with the more significant harms that flow from legislative decisions that "serve no *1039 purpose other than to favor one segmentÔÇöwhether racial, ethnic, religious, economic, or politicalÔÇöthat may occupy a position of strength at a particular point in time, or to disadvantage a politically weak segment of the community." Karcher v. Daggett, 462 U. S. 725, 748 (1983) (Stevens, J., concurring). These cases are as good an illustration of such self-serving behavior on the part of legislators as anyÔÇöbut not with respect to racial gerrymandering. The real problem is the politically motivated gerrymandering that occurred in Texas. Many of the oddest twists and turns of the Texas districts would never have been created if the legislature had not been so intent on protecting party and incumbents. See also Shaw II, ante, at 937-938 (Stevens, J., dissenting) (noting the same influences behind the bizarre shape of North Carolina's District 12).
By minimizing the critical role that political motives played in the creation of these districts, I fear that the Court may inadvertently encourage this more objectionable use of power in the redistricting process.[35] Legislatures and elected representatives have a responsibility to behave in a way that incorporates the "elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially." Cleburne, 473 U. S., at 452. That responsibility is not discharged when legislatures permit and even encourage incumbents to use their positions as public servants to protect themselves and their parties rather than the interests of their constituents. See Karcher v. Daggett, 462 U. S., at 748, 754 (Stevens, J., concurring). If any lines in Texas are worth straightening, *1040 it is those that were twisted to exclude, not those altered to include.[36]

VII
The history of race relations in Texas and throughout the South demonstrates overt evidence of discriminatory voting practices lasting through the 1970's. Brischetto, Richards, Davidson, & Grofman, Texas, in Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990, pp. 233-248 (C. Davidson & B. Grofman eds. 1994). Even in recent years, Texans have elected only two black candidates to statewide office; majority-white Texas districts have never elected a minority to either the State Senate or the United States Congress. Brief for Appellants in No. 94ÔÇö 806, p. 53. One recent study suggests that majority-white districts throughout the South remain suspiciously unlikely *1041 to elect black representatives. Davidson & Grofman, The Effect of Municipal Election Structure on Black Representation in Eight Southern States, in Quiet Revolution in the South, at 344. And nationwide, fewer than 15 of the hundreds of legislators that have passed through Congress since 1950 have been black legislators elected from majoritywhite districts.[37] In 1994, for example, 36 of the Nation's 39 black Representatives were elected from majority-minority districts, while only 3 were elected from majority-white districts.[38] See post, at 1050-1051 (Souter, J., dissenting).
Perhaps the state of race relations in Texas and, for that matter, the Nation, is more optimistic than might be expected in light of these facts. If so, it may be that the plurality's exercise in redistricting will be successful. Perhaps minority candidates, forced to run in majority-white districts, will be able to overcome the long history of stereotyping and discrimination that has heretofore led the vast majority of majority-white districts to reject minority candidacies. Perhaps not. I am certain only that bodies of elected federal and state officials are in a far better position than anyone on this Court to assess whether the Nation's long history of discrimination has been overcome, and that nothing in the Constitution requires this unnecessary intrusion into the ability of States to negotiate solutions to political differences while providing long-excluded groups the opportunity to participate effectively in the democratic process. I respectfully dissent.
[Appendixes to opinion of Stevens, J., follow this page.]
*1042 APPENDIX A TO OPINION OF STEVENS, J. 
TEXAS CONGRESSIONAL DISTRICT 3
*1043 APPENDIX B TO OPINION OF STEVENS, J. 
TEXAS CONGRESSIONAL DISTRICT 6
*1044 APPENDIX C TO OPINION OF STEVENS, J. 
TEXAS CONGRESSIONAL DISTRICT 25 APPENDIX D TO OPINION OF STEVENS, J. DALLAS-FORT WORTH AREA CONGRESSIONAL DISTRICTS After 1991 Redistricting 
Before 1991 Redistricting H = Incumbent Residence
*1045 Justice Souter, with whom Justice Ginsburg and Justice Breyer join, dissenting.
When the Court devises a new cause of action to enforce a constitutional provision, it ought to identify an injury distinguishable from the consequences of concededly constitutional conduct, and it should describe the elements necessary and sufficient to make out such a claim. Nothing less can give notice to those whose conduct may give rise to liability or provide standards for courts charged with enforcing the Constitution. Those principles of justification, fair notice, and guidance have never been satisfied in the instance of the action announced three Terms ago in Shaw v. Reno, 509 U. S. 630 (1993) (Shaw I) , when a majority of this Court decided that a State violates the Fourteenth Amendment's Equal Protection Clause by excessive consideration of race in drawing the boundaries of voting districts, even when the resulting plan does not dilute the voting strength of any voters and so would not otherwise give rise to liability under the Fourteenth or Fifteenth Amendments, or under the Voting Rights Act.
Far from addressing any injury to members of a class subjected to differential treatment, the standard presupposition of an equal protection violation, Shaw I addressed a putative harm subject to complaint by any voter objecting to an untoward consideration of race in the political process. Although the Court has repeatedly disclaimed any intent to go as far as to outlaw all conscious consideration of race in districting, after three rounds of appellate litigation seeking to describe the elements and define the contours of the Shaw cause of action, a helpful statement of a Shaw claim still eludes this Court. This is so for reasons that go to the conceptual bone.
The result of this failure to provide a practical standard for distinguishing between the lawful and unlawful use of race has not only been inevitable confusion in statehouses and courthouses, but a consequent shift in responsibility for *1046 setting district boundaries from the state legislatures, which are invested with front-line authority by Article I of the Constitution, to the courts, and truly to this Court, which is left to superintend the drawing of every legislative district in the land.
Today's opinions do little to solve Shaw `s puzzles or return districting responsibility to the States. To say this is not to denigrate the importance of Justice O'Connor's position in her separate opinion, ante, at 990-992, that compliance with  2 of the Voting Rights Act is a compelling state interest; her statement takes a very significant step toward alleviating apprehension that Shaw is at odds with the Voting Rights Act. It is still true, however, that the combined plurality, minority, and Court opinions do not ultimately leave the law dealing with a Shaw claim appreciably clearer or more manageable than Shaw I itself did. And to the extent that some clarity follows from the knowledge that race may be considered when reasonably necessary to conform to the Voting Rights Act, today's opinions raise the specter that this ostensible progress may come with a heavy constitutional price. The price of Shaw I, indeed, may turn out to be the practical elimination of a State's discretion to apply traditional districting principles, widely accepted in States without racial districting issues as well as in States confronting them.
As the flaws of Shaw I persist, and as the burdens placed on the States and the courts by Shaw litigation loom larger with the approach of a new census and a new round of redistricting, the Court has to recognize that Shaw `s problems result from a basic misconception about the relation between race and districting principles, a mistake that no amount of case-by-case tinkering can eliminate. There is, therefore, no reason for confidence that the Court will eventually bring much order out of the confusion created by Shaw I, and because it has not, in any case, done so yet, I respectfully dissent.

*1047 I
As its text indicates and our cases have necessarily and repeatedly recognized,[1] Article I of the Constitution places responsibility for drawing voting districts on the States in the first instance. See Art. I,  2, cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature"); Art. I,  4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations"). The Court has nonetheless recognized limits on state districting autonomy when it could discern a strong constitutional justification and a reasonably definite standard for doing so, as, for example, in announcing the numerical requirement of one person, one vote, see Reynolds v. Sims, 377 U. S. 533 (1964).[2] But the Court has never ignored the *1048 Constitution's commitment of districting responsibility to the political branches of the States and has accordingly assumed over the years that traditional districting principles widely accepted among States represented an informal baseline of acceptable districting practices. We have thus accorded substantial respect to such traditional principles (as those, for example, meant to preserve the integrity of neighborhood communities, to protect incumbents, to follow existing political boundaries, to recognize communities of interest, and to achieve compactness and contiguity); we have seen these objectives as entirely consistent with the Fourteenth and Fifteenth Amendments' demands. See, e. g., id., at 578 ("A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme"); White v. Weiser, 412 U. S. 783, 797 (1973) ("[T]he District Court did not suggest or hold that the legislative policy of districting so as to preserve the constituencies of congressional incumbents was unconstitutional or even undesirable"); Voinovich v. Quilter, 507 U. S. 146, 156 (1993) ("Because the States . . . derive their reapportionment authority . . . from independent provisions of state and federal law, the federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements") (internal quotation marks omitted; citation omitted).
The fundamental tenet underlying most of these constitutionally unobjectionable principles (respect for communities of interest or neighborhoods, say) is that voting is more than *1049 an atomistic exercise.[3] Although it is the law of the Constitution that representatives represent people, not places or things or particular interests, Reynolds, supra, at 562, the notion of representative democracy within the federalist framework presumes that States may group individual voters together in a way that will let them choose a representative not only acceptable to individuals but ready to represent widely shared interests within a district. Aleinikoff & Issacharoff, Race and Redistricting: Drawing Constitutional Lines After Shaw v. Reno, 92 Mich. L. Rev. 588, 601 (1993) ("It is only as collective partisans of the same political preferenceÔÇöwhether that preference is defined by party or race or any other measureÔÇöthat voters can assert their right to meaningful participation in the political process"). Hence, in respecting the States' implementation of their own, traditional districting criteria, the Court has recognized the basically associational character of voting rights in a representative democracy.

*1050 A
Accordingly, before Shaw I, the Court required evidence of substantial harm to an identifiable group of voters to justify any judicial displacement of these traditional districting principles. Such evidence existed in Reynolds v. Sims, supra, when the disparate weighting of votes was held unconstitutional, and it was present again when the Court recognized the unconstitutional consequences of vote dilution, see Whitcomb v. Chavis, 403 U. S. 124 (1971); White v. Regester, 412 U. S. 755 (1973). In the one case, the harm was mathematically identifiable; in the other, the arithmetic provided powerful circumstantial evidence of the impossibility of political success for the chosen candidate of a racial and numerical minority in an area with pervasive racial-bloc voting. In both cases, the complainants were from an easily identified group of voters; and even in cases of racial votedilution claims, which were conceptually more difficult to state than the principle of one person, one vote, there were readily recognized examples of the harm in question. Indeed, even when one acknowledged that voters would be served by a representative not of their own race and that the Constitution guaranteed no right to pick a winner, see Whitcomb, supra, at 153-155, it was impossible to see mere happenstance in the facts that the American voting-age population was 10.5% black, but the Congress that assembled in 1981 had only 17 black representatives out of 435 and no black senator. Statistical Abstract of the United States, 1982-83, p. 490 (103d ed. 1982) (Table 802); Black Americans: A Statistical Sourcebook 142 (L. Hornor ed. 1995) (Table 4.02); see also Parker, The Damaging Consequences of the Rehnquist Court's Commitment to Color-Blindness Versus Racial Justice, 45 Am. U. L. Rev. 763, 770-771 (1996) (observing that "[p]rior to the latest round of redistricting after the 1990 Census, . . . [b]lacks, who constitute 11.1% of the nation's voting age population, made up only 4.9% of the members of Congress"). The conclusion was inescapable that what we *1051 know of as intentional vote dilution accounted for this astonishing fact,[4] just as it is equally inescapable that remedies for vote dilution (and hedges against its reappearance) in the form of majority-minority districts account for the fact that the 104th Congress showed an increase of 39 black Members over the 1981 total. Minorities in Congress, 52 Cong. Q., Supplement to No. 44, p. 10 (Nov. 12, 1994); see also Parker, supra, at 771 (noting "a fifty percent increase in the number of black members of Congress").[5]
*1052 Before Shaw I, we not only thus limited judicial interference with state districting efforts to cases of readily demonstrable harm to an identifiable class of voters, but we also confined our concern with districting to cases in which we were capable of providing a manageable standard for courts to apply and for legislators to follow. Within two years of holding in Baker v. Carr, 369 U. S. 186 (1962), that malapportionment was a justiciable issue, "the Court recognized that its general equal protection jurisprudence was insufficient for the task and announced an increasingly rigid, simple to apply, voting-specific mandate of equipopulousity." Karlan, Still Hazy After All These Years: Voting Rights in the PostShaw Era, 26 Cumberland L. Rev. 287, 299 (1996) (hereinafter Karlan, Post-Shaw Era). Likewise, although it is quite true that the common definition of a racial vote-dilution injury ("less opportunity . . . to participate in the political process and to elect representatives . . . ," 42 U. S. C.  1973(b)) is no model of concrete description, the Court has identified categories of readily comprehensible evidence bearing on the likelihood of such an injury, including facts about size of minority population, quantifiable indications of political cohesiveness and bloc voting, historical patterns of *1053 success or failure of favored candidates, and so on. See, e. g., Thornburg v. Gingles, 478 U. S. 30 (1986); White v. Regester, 412 U. S., at 766-770. The particularity of this evidence goes far to separate victims of political "inequality" from those who just happened to support losing candidates.

B
Shaw I, however, broke abruptly with these standards, including the very understanding of equal protection as a practical guarantee against harm to some class singled out for disparate treatment. Whereas malapportionment measurably reduces the influence of voters in more populous districts, and vote dilution predestines members of a racial minority to perpetual frustration as political losers, what Shaw I spoke of as harm is not confined to any identifiable class singled out for disadvantage. See Shaw v. Hunt, ante, at 923-925, 928 (Shaw II) (Stevens, J., dissenting) (noting the absence of a customary disadvantaged class and describing the Shaw I cause of action as a substantive due process, rather than an equal protection, claim). If, indeed, what Shaw I calls harm is identifiable at all in a practical sense, it would seem to play no favorites, but to fall on every citizen and every representative alike. The Court in Shaw I explained this conception of injury by saying that the forbidden use of race "reinforces the perception that members of the same racial group . . . think alike, share the same political interests, and will prefer the same candidates at the polls," and that it leads elected officials "to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." Shaw I, 509 U. S., at 647-648. This injury is probably best understood as an "expressive harm," that is, one that "results from the idea or attitudes expressed through a governmental action, rather than from the more tangible or material consequences the action brings about." Pildes & Niemi, Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating *1054 Election-District Appearances after Shaw v. Reno, 92 Mich. L. Rev. 483, 506-507 (1993); see also id., at 493 ("The theory of voting rights [that Shaw I ] endorses centers on the perceived legitimacy of structures of political representation, rather than on the distribution of actual political power between racial or political groups"). To the extent that racial considerations do express such notions, their shadows fall on majorities as well as minorities, whites as well as blacks, the politically dominant as well as the politically impotent. Thus, as an injury supposed to be barred by the Equal Protection Clause, this subject of the "analytically distinct" cause of action created by Shaw I, supra, at 652, bears virtually no resemblance to the only types of claims for gerrymandering we had deemed actionable following Davis v. Bandemer, 478 U. S. 109 (1986), those involving districting decisions that removed an identifiable class of disfavored voters from effective political participation. See, e. g., Gomillion v. Lightfoot, 364 U. S. 339 (1960); Thornburg v. Gingles, supra .[6]
Just as the logic of traditional equal protection analysis is at odds with Shaw `s concept of injury, so the Court's rhetoric of racially motivated injury is inapposite to describe the consideration of race that it thinks unreasonable. Although the Court used the metaphor of "political apartheid" as if to refer to the segregation of a minority group to eliminate its association with a majority that opposed integration, Shaw I, supra, at 647, talk of this sort of racial separation is not on point here. The de jure segregation that the term "political *1055 apartheid" brings to mind is unconstitutional because it emphatically implies the inferiority of one race. See Brown v. Board of Education, 347 U. S. 483, 494 (1954) ("To separate [minority children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community"). Shaw I, in contrast, vindicated the complaint of a white voter who objected not to segregation but to the particular racial proportions of the district. See Karlan, Our Separatism? Voting Rights as an American Nationalities Policy, 1995 U. Chi. Legal Forum 83, 94 (hereinafter Karlan, Our Separatism) (noting the irony of using the term "apartheid" to describe what are "among the most integrated districts in the country"). Whatever this district may have symbolized, it was not "apartheid." Nor did the proportion of its racial mixture reflect any purpose of racial subjugation, the district in question having been created in an effort to give a racial minority the same opportunity to achieve a measure of political power that voters in general, and white voters and members of ethnic minorities in particular, have enjoyed as a matter of course. In light of a majority-minority district's purpose to allow previously submerged members of racial minorities into the active political process, this use of race cannot plausibly be said to affect any individual or group in any sense comparable to the injury inflicted by de jure segregation. It obviously conveys no message about the inferiority or outsider status of members of the white majority excluded from a district. And because the condition addressed by creating such a district is a function of numbers, the plan implies nothing about the capacity or value of the minority to which it gives the chance of electoral success.
Added to the anomalies of Shaw I `s idea of equal protection injury and the rhetoric of its descriptions, there is a further conceptual inadequacy in Shaw I. Whereas it defines injury as the reinforcement of the notion that members of a racial group will prefer the same candidates at the polls, the immediate *1056 object of the constitutional prohibition against the intentional dilution of minority voting strength is to protect the right of minority voters to make just such a preference effective. There would, for example, be no vote dilution by virtue of racial-bloc voting unless voters of a racial minority would themselves tend to stick together in voting for a given candidate (perhaps, though not necessarily, of their own race, as well). Indeed, if there were no correlation between race and candidate preference, it would make no sense to say that minority voters had less opportunity than others to elect whom they would; they would be part of the mainstream and the winners would be their own choices. When voting is thus racially polarized, it is just because of this polarization that majority-minority districts provide the only practical means of avoiding dilution or remedying the dilution injury that has occurred already. Shaw I has thus placed those who choose to avoid the long-recognized constitutional harm of vote dilution at risk by casting doubt on the legitimacy of its classic remedy; the creation of a majority-minority district "reinforces" the notion that there is a correlation between race and voting, for that correlation is the very condition on which the success of the court-ordered remedy depends. So it is that the Court's definition of injury is so broad as to cover constitutionally necessary efforts to prevent or remedy a violation of the Fourteenth and Fifteenth Amendments and of  2 of the Voting Rights Act.
One way to temper the overreach of the Court's concept of injury (though it would not avoid the difficulty that there is no equal protection injury in the usual sense, discussed above, see supra, at 1050) would be simply to exclude by definition from Shaw I injury a use of race in districting that is reasonably necessary to remedy or avoid dilution; the Court's move at least in this direction, see infra, at 1066ÔÇö 1069, is a sound one, as is its continuing recognition (despite its broad definition of harm) that not every intentional creation of a majority-minority district requires strict scrutiny. *1057 See ante, at 958; ante, at 993 (O'Connor, J., concurring); cf. Miller, 515 U. S., at 928 (O'Connor, J., concurring). But the suggested qualification would fall short of eliminating the difficulty caused by the existing definition, for the uses of race to remedy past dilution or to hedge against future dilution are not the only legitimate uses of race that are covered, and threatened, by the overbreadth of the Shaw injury. This will become clear in examining the Court's efforts to solve its definitional problems by relying upon the degree to which race is used in defining the injury it discerns.

C
The Court's failure to devise a concept of Shaw harm that distinguishes those who are injured from those who are not, or to differentiate violation from remedy, is matched by its inability to provide any manageable standard to distinguish forbidden districting conduct from the application of traditional state districting principles and the plans that they produce. This failure, while regrettable, need not have occurred, for when the Court spoke in Shaw I of a district shape so "bizarre" as to be an unequivocal indication that race had influenced the districting decision to an unreasonable degree, Shaw I could have been pointing to some workable criterion of shape translatable into objective standards. Leaving Shaw `s theoretical inadequacies aside, it would have been possible to devise a cause of action that rested on the expressive character of a district's shape, and created a safe harbor in the notion of a compact district objectively quantified in terms of dispersion, perimeter, and population. See Pildes & Niemi, 92 Mich. L. Rev., at 553-575. Had the Court followed this course, the districts whose grotesque shapes provoke the sharpest reaction would have been eliminated in racially mixed States, which would have known how to avoid Shaw violations and, thus, federal judicial intrusion. Shaw would have been left a doctrinal incongruity, but not an unmanageable one.
*1058 The Court, however, rejected this opportunity last Term in Miller v. Johnson, supra, when it declined to contain Shaw by any standard sufficiently quantifiable to guide the decisions of state legislators or to inform and limit review of districting decisions by the courts. The Court rejected shape as a sufficient condition for finding a Shaw violation, or even a necessary one. 515 U. S., at 915. See also Issacharoff, The Constitutional Contours of Race and Politics, 1995 S. Ct. Rev. 45, 56 (hereinafter Issacharoff, Constitutional Contours) ("Miller is rather categorical in its refusal to limit the application of the equal protection clause to bizarre districts alone"). Instead, it recharacterized the cause of action in terms devised in other cases addressing essentially different problems, by proscribing the consideration of race when it is the "predominant factor motivating the legislatur[e]," 515 U. S., at 916, or when the use of race is "in substantial disregard of customary and traditional districting practices," id., at 928 (O'Connor, J., concurring).
As a standard addressed to the untidy world of politics, neither "predominant factor" nor "substantial disregard" inspires much hope.[7] It is true of course that the law rests certain other liability decisions on the feasibility of untangling mixed motives, and courts and juries manage to do the untangling. See, e. g., Mt. Healthy City Bd. of Ed. v. Doyle, 429 U. S. 274, 287 (1977) (employee's burden to show that constitutionally protected conduct is a "substantial factor" in *1059 decision not to rehire him; employer's burden to show that it would have made same decision "even in the absence of the protected conduct"); Hunter v. Underwood, 471 U. S. 222, 228 (1985) ("Once racial discrimination is shown to have been a `substantial' or `motivating' factor behind the enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor"); but see Arlington Heights v. Metropolitan Housing Development Corp., 429 U. S. 252, 265 (1977) ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the `dominant' or `primary' one"). At first glance, then, it may not seem entirely out of the question for courts to sort out the strands in Shaw cases. But even this cool comfort would be misplaced.
While a court may be entitled to some confidence that in most cases it will be able, for example, to distinguish the relative strength of an employer's dissatisfaction with an employee's job performance from his displeasure over a worker's union membership, see NLRB v. Transportation Management Corp., 462 U. S. 393, 403-405 (1983), such confidence would be unwarranted in the districting context. It is not merely that the very nature of districting decisions makes it difficult to identify whether any particular consideration, racial or otherwise, was the "predominant motive," though that is certainly true:
"Districting plans are integrated bundles of compromises, deals and principles. To ask about the reason behind the design of any one particular district is typically to implicate the entire pattern of purposes and trade-offs behind a districting plan as a whole. Searching for `the reason' or `the dominant reason' behind a particular district's shape is often like asking why one year's federal budget is at one level rather than another. Moreover, to require a coherent explanation for the specific *1060 shape of even one district is to impose a model of legalistic decisionmaking on the one political process that least resembles that model." Pildes & Niemi, supra, at 585-586 (footnote omitted).
The reason that use of the predominant motive standard in reviewing a districting decision is bound to fail is more fundamental than that: in the political environment in which race can affect election results, many of these traditional districting principles cannot be applied without taking race into account and are thus, as a practical matter, inseparable from the supposedly illegitimate racial considerations. See Pildes & Niemi, supra, at 578 ("[R]ace frequently correlates with other socioeconomic factors. In evaluating oddly shaped districts, this correlation will require courts to attempt to untangle legitimate communities of interest from the now-illegitimate one of race. If blacks as blacks cannot be grouped into a `highly irregular' district, but urban residents or the poor can, how will courts distinguish these contexts, and under what mixed-motive standard?"); Issacharoff, Constitutional Contours 58 ("Given the palpability of racial concerns in the political arena, [Miller `s causation standard could] either doom all attempts to distribute political power in multi-ethnic communities or . . . fail to provide a basis for distinguishing proper from improper considerations in redistricting").
If, for example, a legislature may draw district lines to preserve the integrity of a given community, leaving it intact so that all of its members are served by one representative, this objective is inseparable from preserving the community's racial identity when the community is characterized, or even self-defined, by the race of the majority of those who live there. This is an old truth, having been recognized every time the political process produced an Irish or Italian or Polish ward.

*1061 "[E]thnicity itself can tie people together, as volumes of social science literature have documentedÔÇöeven people with divergent economic interests. For this reason, ethnicity is a significant force in political life. . . .
. . . . .
". . . The creation of ethnic districts reflecting felt identity is not ordinarily viewed as offensive or demeaning to those included in the delineation." Miller v. Johnson, 515 U. S., at 944-945 (Ginsburg, J., dissenting).
Or take the traditional principle of providing protection for incumbents. The plurality seems to assume that incumbents may always be protected by drawing lines on the basis of data about political parties. Cf. ante, at 967-968, 970-971. But what if the incumbent has drawn support largely for racial reasons? What, indeed, if the incumbent was elected in a majority-minority district created to remedy vote dilution that resulted from racial-bloc voting? It would be sheer fantasy to assume that consideration of race in these circumstances is somehow separable from application of the traditional principle of incumbency protection, and sheer incoherence to think that the consideration of race that is constitutionally required to remedy Fourteenth and Fifteenth Amendment vote dilution somehow becomes unconstitutional when aimed at protecting the incumbent the next time the census requires redistricting.
Thus, it is as impossible in theory as in practice to untangle racial consideration from the application of traditional districting principles in a society plagued by racial-bloc voting[8] with a racial minority population of political significance, or at least the unrealized potential for achieving it. And it *1062 is for just this fundamental reason that a test turning on predominant purpose is incapable of producing any answer when traditional districting principles are applied in the political environment in which Shaw I actions are brought.

II
Shaw I `s recognition of a misuse of race in districting even when no vote dilution results thus rests upon two basic deficiencies: first, the failure to provide a coherent concept of equal protection injury, there being no separably injured class and no concept of harm that would not condemn a constitutionally required remedy for past dilution as well as many of the districting practices that the Court is seeking to preserve; second, the failure to provide a coherent test for distinguishing a "predominant" racial consideration from the application of traditional districting principles in a society whose racial mixture is politically significant and where racial-bloc voting exists. The necessary consequence of these shortcomings is arbitrariness; it is impossible to distinguish what is valid from what is not, or to decide how far members of racial minorities may engage "in the same sort of pluralist electoral politics that every other bloc of voters enjoys." Karlan, Our Separatism 103. Indeed, if one needed further proof of this arbitrariness, one need go no further than Justice Stevens's dissent in this case. The plurality effectively concedes that Justice Stevens has not unfairly applied the principles governing the Shaw cause of action, cf. ante, at 971, n. (noting that "[i]n the application of our precedents to District 30, our disagreement with Justice Stevens' dissent, [ante] , at 1014-1031, is largely factual"); in my judgment he has faithfully applied those principles in the spirit intended by the plurality. And yet the conclusions that the two sides reach after applying precisely the same test could not be more different.
*1063 Along with this endemic unpredictability has come the destruction of any clear incentive for the States with substantial minority populations to take action to avoid vote dilution. Before Shaw, state politicians who recognized that minority vote dilution had occurred, or was likely to occur without redistricting aimed at preventing it, could not only urge their colleagues to do the right thing under the Fourteenth Amendment, but counsel them in terrorem that losing a dilution case would bring liability for counsel fees under 42 U. S. C.  1988(b) or 42 U. S. C.  1973l (e). See Issacharoff, Constitutional Contours 48 ("Minority political actors could leverage not only their political power but the enforcement provisions of Section 5 of the Voting Rights Act, and the threat of suit under Section 2 of the Act against adverse districting decisions"); cf. Hastert v. Illinois State Bd. of Election Commr's, 28 F. 3d 1430, 1444 (CA7 1993) (awarding fees to the prevailing parties in a case in which the state legislature failed to draw congressional districts, over the Board of Elections's objection that it had "no interest in the eventual outcome except that there be an outcome" for it to implement) (emphasis in original). But this argument is blunted now, perhaps eliminated in practice, by the risk of counsel fees in a Shaw I action. States seeking to comply in good faith with the requirements of federal civil rights laws "now find themselves walking a tightrope: if they draw majority-black districts they face lawsuits under the equal protection clause; if they do not, they face both objections under section 5 of the Voting Rights Act and lawsuits under section 2." Karlan, Post-Shaw Era 289. See ante, at 1037 (Stevens, J., dissenting) ("On one hand, States will risk violating the Voting Rights Act if they fail to create majorityminority districts. If they create those districts, however, they may open themselves to liability under Shaw and its progeny"). The States, in short, have been told to get things just right, no dilution and no predominant consideration *1064 of race short of dilution, without being told how to do it. The tendency of these conflicting incentives is toward a stalemate, and neither the moral force of the Constitution nor the mercenary threat of liability can operate effectively in this obscurity.
As a consequence, where once comprehensible districting obligations confronted the legislators and governors of the States, there is now a vacuum of responsibility in any State with the mixed population from which Shaw suits come. We can no longer say with the old assurance that such States have a duty to comply with federal requirements in districting, since a State, like an individual, can hardly be blamed for failing to fulfill an obligation that has never been explained. It is true, of course, that a State may suffer consequences if the ultimate arbiter decides on a result different from the one the State has put in place, but that bad luck does not change the fact that a State cannot be said to be obliged to apply a standard that has not been revealed. Because the responsibility for the result can only be said to rest with the final arbiter, the practical responsibility over districting has simply shifted from the political branches of the States with mixed populations to the courts, and to this Court in particular. "The Court has apparently set itself upon a course of . . . reviewing challenged districts one by one and issuing opinions that depend so idiosyncratically on the unique facts of each case that they provide no real guidance to either lower courts or legislatures." Karlan, Post-Shaw Era 288. The tragedy in this shift of political responsibility lies not only in the fact of its occurrence in this instance, but in the absence of coherent or persuasive justifications for causing it to occur.

III
Although today's cases do not address the uncertainties that stem from Shaw `s underlying incoherence, they do aim to mitigate its inscrutability with some specific rules.

*1065 A
In each of today's cases, the Court expressly assumes that avoiding a violation of the Voting Rights Act qualifies as a sufficiently compelling government interest to satisfy the requirements of strict scrutiny. See ante, at 977 ("As we have done in each of our three previous cases .. . , we assume without deciding that compliance with the results test [of  2 of the Voting Rights Act] . . . can be a compelling state interest"); Shaw II, ante, at 915 ("We assume, arguendo, for the purpose of resolving this case, that compliance with  2 could be a compelling interest"). While the Court's decision to assume this important point, arguendo, is no holding, see Seminole Tribe of Fla. v. Florida, ante, at 125 (Souter, J., dissenting), the assumption itself is encouraging because it confirms the view that the intentional creation of majorityminority districts is not necessarily a violation of Shaw I, ante, at 958 (strict scrutiny does not "apply to all cases of intentional creation of majority-minority districts"), and it indicates that the Court does not intend to bring the Shaw cause of action to what would be the cruelly ironic point of finding in the Voting Rights Act of 1965 (as amended) a violation of the Fourteenth Amendment's equal protection guarantee. Cf. Pildes & Niemi, 92 Mich. L. Rev., at 498 (observing that "[i]f the Court believed there were serious constitutional questions with the fundamental structure of this scheme, the Court had numerous means to avoid permitting an unconstitutionally composed legislature to assume power," and seeing the reservation of this question in Voinovich v. Quilter, 507 U. S., at 157, as "evidence that a majority of the Court is not prepared to find a general ban on raceconscious districting in the Constitution"). Justice O'Connor's separate opinion, ante, at 990-992, bears on each of these points all the more emphatically, for her view that compliance with  2 is (not just arguendo ) a compelling state interest and her statement of that position virtually insulate the Voting Rights Act from jeopardy under Shaw as such.

*1066 B
The second point of reference to come out of today's cases is the rule that if a State begins its map-drawing efforts with a compact majority-minority district required by Gingles, the State may not rely too heavily on racial data in adjusting that district to serve traditional districting principles. While this rule may indeed provide useful guidance to state legislatures, its inherent weakness is clear from what was said above, supra, at 1060-1062: it is in theory and in fact impossible to apply "traditional districting principles" in areas with substantial minority populations without considering race. As to some of those principles, to be sure, the ban on the overuse of racial data may not have much significance; racially identified communities can be identified in other ways and will be, after today. But protecting a minority incumbent may be another matter, since we cannot assume, as the plurality does, that reliance on information about "party affiliation" will serve to protect a minority incumbent, and we cannot tell when use of racial data will go too far on the plurality's view, ante, at 962-963. It therefore may well be that loss of the capacity to protect minority incumbency is the price of the rule limiting States' use of racial data. If so, it will be an exceedingly odd result, when the whole point of creating yesterday's majority-minority district was to remedy prior dilution, thus permitting the election of the minority incumbent who (the Court now seems to declare) cannot be protected as any other incumbent could be.

C
The third point of reference attributable to today's cases is as yet only a possibility; a suggestion in the discussions of the narrow tailoring test that States seeking to avoid violating  2 of the Voting Rights Act may draw the district that the Voting Rights Act compels, and this district alone. See Shaw II, ante, at 915-918 (rejecting North Carolina's District 12 because it does not sufficiently coincide with the *1067 assumed Gingles district); ante, at 1035 (Stevens, J., dissenting) ("[I]t now seems clear that the only way that a State can both create a majority-minority district and avoid a racial gerrymander is by drawing . . . within the `limited degree of leeway' granted by the Court . . . the precise compact district that a court would impose in a successful  2 challenge"). If the Court were to say that a district drawn to avoid dilution must respond to the dilution threat in some geographically exact way, but see Shaw II, ante, at 916, n. 8 (suggesting that States may have flexibility in complying with  2 of the Voting Rights Act); ante, at 1037 (Stevens, J., dissenting) (noting that States traditionally have enjoyed a broader discretion in drawing district lines), then presumably a district drawn in a race-conscious fashion could survive only if it was as compact as the Gingles district hypothesized for purposes of stating a vote-dilution claim, and positioned where the hypothetical district would be.
If the Court ultimately were to reach such a conclusion, it would in one respect be taking a step back toward Shaw I and its suggestion that a district's shape might play an important, if not determinative role in establishing a cause of action. Such a step would, however, do much more than return to Shaw I, which suggested that a compact district would be a safe haven, but not that the district hypothesized under Gingles was the only haven. See, e. g., Shaw I, 509 U. S., at 646 ("The district lines may be drawn, for example, to provide for compact districts of contiguous territory, or to maintain the integrity of political subdivisions").
I refer to this step as a "possibility" deliberately. The Court in Shaw II does not go beyond an intimation to this effect, and Bush raises doubt that the Court would go so far. See ante, at 977-978 (rejecting the argument made by Justice Stevens); see also ante, at 978 ("[T]he States retain a flexibility that federal courts enforcing  2 lack . . . . And nothing that we say today should be read as limiting `a State's discretion to apply traditional districting principles' *1068 "); but see ante, at 994 (O'Connor, J., concurring) ("[I]f a State pursues that compelling interest by creating a district that `substantially addresses' the potential liability, and does not deviate substantially from a hypothetical courtdrawn  2 district for predominantly racial reasons, its districting plan will be deemed narrowly tailored" (citations omitted)); but see also ante, at 977 ("We also reaffirm that the `narrow tailoring' requirement of strict scrutiny allows the States a limited degree of leeway in furthering such interests. . . . We thus reject, as impossibly stringent, the District Court's view of the narrow tailoring requirement, that `a district must have the least possible amount of irregularity in shape, making allowances for traditional districting criteria' " (citation omitted)). Indeed, Bush leaves open the possibility that a State could create a majority-minority district that does not coincide with the Gingles shape so long as racial data are not overused, ante, at 962, 981, and it does not suggest that a Shaw claim could be premised solely on a deviation from a Gingles district.
Suffice it to say for now that if the Court were to try to render Shaw more definite by imposing any such limitations on shape and placement, the added measure of clarity would either be elusive or it would come at an exorbitant price from States seeking to comply with the Voting Rights Act and the Fourteenth and Fifteenth Amendments. It would be elusive if the Court meant that race could be considered in alleviating racial dilution but not in applying any traditional districting principle: we have already seen that race is inextricably intertwined with some common districting principles when applied in a multiracial society. See supra, at 1060-1062. Or it would come at an exorbitant price, because no other districting principle would be allowed to affect the compactness or placement that would be required for purposes of Gingles. The Court would thus be cutting back on a State's power to vary district shape through its application of the very districting principles that are supposed to predominate *1069 in importance over racial consideration. That is, the Court would be reducing the discretion of a State seeking to avoid or correct dilution to the scope of a federal court's discretion when devising a remedy for dilution. There could, of course, be no justification for taking any such step. While there is good reason to limit a federal court's discretion to interfere in a State's political process when it employs its remedial power in dilution cases, cf. Voinovich v. Quilter, 507 U. S., at 156 ("Federal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States . . . to conduct apportionment"), there is no apparent reason to impose the same limitations upon the discretion accorded to a State subject to an independent constitutional duty to make apportionment decisions, see ibid. ("Because the States . . . derive their reapportionment authority . . . from independent provisions of state and federal law, . . . the federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements") (internal quotation marks omitted). The principles of federalism that we have tried to follow strongly counsel against imposing any such limitations.

D
In sum, the three steps the Court takes today toward a more definite cause of action either fail to answer the objections to Shaw I or prompt objections of their own. Recognition of a State's interest in complying with the Voting Rights Act does not address the practical impossibility courts will encounter in identifying a predominant use of race, as distinguished from some lesser, reasonable consideration of it, when a State applies its customary districting principles. The limitation on the use of racial data is unlikely to make much difference in practice except to jeopardize minority incumbency protection. And the possibility that the Court will require Gingles districts (or districts substantially close *1070 to them) when compliance with  2 of the Voting Rights Act is an object of districting would render a State's districting obligation more definite only by eliminating its ability to apply the very districting principles traditionally considered to be important enough to furnish a theoretical baseline of reasonable districting practices.

IV
If today's developments fall short of curing Shaw `s unworkability, it must be said that options for addressing them are few. Assuming that Shaw is not to be overruled as a flawed experiment, the Court may select from two alternatives, depending on whether its weightier concern is to preserve traditional districting principles or to cure the anomalies created by Miller `s "predominant purpose" criterion.
If the Court's first choice is to preserve Shaw in some guise with the least revolutionary effect on districting principles and practice, the Court could give primacy to the principle of compactness and define the limits of tolerance for unorthodox district shape by imposing a measurable limitation on the bizarre, presumably chosen by reference to historical practice (adjusted to eliminate the influence of any dilution that very practice may have caused in the past, cf. Pildes & Niemi, 92 Mich. L. Rev., at 573-574, n. 246 (discussing the egregious racial gerrymanders of the 19th century)) and calculated on the basis of a district's dispersion, perimeter, and population. See id., at 553-575. This alternative would be true to Shaw I in maintaining that a point can be reached when the initially lawful consideration of race becomes unreasonable and in identifying appearance as the expression of undue consideration; and it would eliminate Miller `s impossible obligation to untangle racial considerations from so-called "race-neutral" objectives (such as according respect to community integrity and protecting the seats of *1071 incumbents) when the racial composition of a district and voter behavior bar any practical chance of separating them. The incongruities of Shaw `s concept of injury when considered in light of our customary equal protection analysis, our remedial practice, and traditional respect for state districting discretion would, of course, persist, but if Shaw were defined by measures that identified forbidden shape as the manifestation of unreasonable racial emphasis, we would at least provide the notice and guidance that are missing from the law today.
The other alternative for retaining a Shaw cause of action in some guise would be to accept the fact that, in the kind of polarized multiracial societies that will generate Shaw actions as presently understood, racial considerations are inseparable from many traditional districting objectives, making it impossible to speak of race as predominating. The consequence of facing this reality is that if some consideration of race is to be forbidden as supposedly unreasonable in degree, then the use of districting principles that implicate the use of race must be forbidden. That is, traditional districting practices must be eliminated. Such a result would, of course, be consistent with Shaw I `s concept of injury as affecting voters of whatever race. But cf. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U. S. 464, 489 (1982) (fact that some expressive harms are insufficient to satisfy Article III standing requirements does not allow for relaxation of those requirements). The result, in short, would be colorblindness in determining the manner of choosing representatives, either by eliminating the practice of districting entirely, or by replacing it with districting on some principle of randomness that would not account for race in any way.
While such is the direction in which Shaw and Miller together point, the objections to following any such course seem insurmountable. The first is the irony that the price *1072 of imposing a principle of colorblindness in the name of the Fourteenth Amendment would be submerging the votes of those whom the Fourteenth and Fifteenth Amendments were adopted to protect, precisely the problem that necessitated our recognition of vote dilution as a constitutional violation in the first place. Eliminating districting in the name of colorblindness would produce total submersion; random submersion (or packing) would result from districting by some computerized process of colorblind randomness. Thus, unless the attitudes that produce racial-bloc voting were eliminated along with traditional districting principles, dilution would once again become the norm. While dilution as an intentional constitutional violation would be eliminated by a randomly districted system, this theoretical nicety would be overshadowed by the concrete reality that the result of such a decision would almost inevitably be a socalled "representative" Congress with something like 17 black members. See supra, at 1050. In any event, the submergence would violate the prohibition of even nonintentional dilution found in  2 of the Voting Rights Act. The only way to avoid this conflict would be to declare the Voting Rights Act unconstitutional, a prospect hardly in harmony with the Court's readiness to assume today that compliance with the Voting Rights Act qualifies as a compelling state interest for purposes of litigating a Shaw claim.
The second objection is equally clear. Whatever may be the implications of what I have called Shaw `s failings, the Court has repeatedly made it plain that Shaw was in no way intended to effect a revolution by eliminating traditional districting practice for the sake of colorblindness. Shaw I, 509 U. S., at 642 ("Despite their invocation of the ideal of a `color-blind' Constitution, see Plessy v. Ferguson, 163 U. S. 537, 559 (1896) (Harlan, J., dissenting), appellants appear to concede that race-conscious districting is not always unconstitutional. . . . That concession is wise: This Court *1073 never has held that race-conscious state decisionmaking is impermissible in all circumstances"); cf. Richmond v. J. A. Croson Co., 488 U. S. 469, 520-521 (1989) (Scalia, J., concurring in judgment) (criticizing the majority for rejecting a strict principle of colorblindness). Indeed, the very fear that led to the creation of the Shaw cause of action was that racial concerns were taking too heavy a toll on districting practices that had evolved over the years through the political process. Shaw I, 509 U. S., at 644-649. Justice O'Connor, moreover, has made it obvious that race has a legitimate place in districting, id., at 642 ("[R]aceconscious redistricting is not always unconstitutional"); Miller, 515 U. S., at 928-929 (O'Connor, J., concurring); ante, at 993 (O'Connor, J., concurring), that the intentional creation of majority-minority districts is not forbidden by Shaw, Miller, supra, at 928 (O'Connor, J., concurring) (districts may be permissible "even though race may well have been considered in the redistricting process"); ante, at 990ÔÇö 992 (O'Connor, J., concurring), and that Shaw was aimed at only the exceptional district, 515 U. S., at 928-929 ("Application of the Court's standard does not throw into doubt the vast majority of the Nation's 435 congressional districts"). Of the present Court majority, only Justices Scalia and Thomas are on record as concluding that any intentional creation of a majority-minority district is a forbidden racial gerrymander. Ante, at 1001 (Thomas, J., concurring in judgment).
Since a radical transformation of the political selection process in the name of colorblindness is out of the question, the Court's options for dealing with Shaw `s unworkability are in truth only these: to confine the cause of action by adopting a quantifiable shape test or to eliminate the cause of action entirely. Because even a truncated Shaw would rest on the untenable foundation I have described, and the supposed, expressive harm Shaw seeks to remedy is unlikely *1074 to justify the disruption that even a modified Shaw would invite, there is presently no good reason that the Court's withdrawal from the presently untenable state of the law should not be complete. While I take the commands of stare decisis very seriously, the problems with Shaw and its progeny are themselves very serious. The Court has been unable to provide workable standards, the chronic uncertainty has begotten no discernible reliance, and the costs of persisting doubt about the limits of state discretion and state responsibility are high.
There is, indeed, an added reason to admit Shaw `s failure in providing a manageable constitutional standard and to allow for some faith in the political process. That process not only evolved the very traditional districting principles that the Court has pledged to preserve, but has applied them in the past to deal with ethnicity in a way that should influence our thinking about the prospects for race. It is difficult to see how the consideration of race that Shaw condemns (but cannot avoid) is essentially different from the consideration of ethnicity that entered American politics from the moment that immigration began to temper regional homogeneity. Recognition of the ethnic character of neighborhoods and incumbents, through the application of just those districting principles we now view as traditional, allowed ethnically identified voters and their preferred candidates to enter the mainstream of American politics, see Miller, supra, at 944-945 (Ginsburg, J., dissenting); D. Judd, The Politics of American Cities: Private Power and Public Policy 70 (3d ed. 1988); see generally S. Erie, Rainbow's End: Irish-Americans and the Dilemmas of Urban Machine Politics, 1840-1985 (1988), and to attain a level of political power in American democracy. The result has been not a state regime of ethnic apartheid, but ethnic participation and even a moderation of ethnicity's divisive effect in political practice. For although consciousness of ethnicity has not disappeared from the *1075 American electorate, its talismanic force does appear to have cooled over time.[9] It took Boston Irish voters, for example, to elect Thomas Menino mayor in 1993.[10]
*1076 There is, then, some reason to hope that if vote dilution is attacked at the same time that race is given the recognition that ethnicity has historically received in American politics, the force of race in politics will also moderate in time. There are even signs that such hope may be vindicated, even if the evidence is necessarily tentative as yet. See U. S. Comm'n on Civil Rights, The Voting Rights Act: Ten Years After, p. 155 (Jan. 1975) ("In many areas the great increase in minority registration and voting since the passage of the Voting Rights Act in 1965 has meant that politicians can no longer afford to ignore minority voters. This has brought about a significant decline in racial appeals by candidates and has made incumbents and candidates more responsive to minority needs"); Carsey, The Contextual Effects of Race on White Voter Behavior: The 1989 New York City Mayoral Election, 57 J. of Politics 221, 228 (1995) (reporting, in 1994, that "the contextual effects of race may not be so different from the contextual effects of factors like partisanship, ethnicity, or social class as we might have believed"); Sigelman, Sigelman, Walkosz, & Nitz, Black Candidates, White Voters: Understanding Racial Bias in Political Perceptions, 39 Am. J. of Political Science 243, 244 (1995) ("Over the years, white Americans have expressed increasing willingness to vote for black candidates"); Peirce, Fresh Air in City Hall, Baltimore Sun, Nov. 8, 1993, p. 7A ("In contest after contest, victory has gone to mayoral candidates who eschew talk of race"); see also Gingles, 478 U. S., at 56 (noting that crossover voting in favor of minority candidates is more common when minority incumbents stand for reelection); Collins v. Norfolk, 883 F. 2d 1232, 1243 (CA4 1989) (same). This possibility that racial politics, too, may grow wiser so long as minority votes are rescued from submergence should be considered in determining how far the Fourteenth and Fifteenth Amendments require us to devise constitutional common law to supplant *1077 the democratic process with litigation in federal courts. It counsels against accepting the profession that Shaw has yet evolved into a manageable constitutional standard, and from that case's invocation again today I respectfully dissent.
NOTES
[*] Thomas J. Wagner and Chester D. Hooper filed a brief for the Maritime Law Association of the United States as amicus curiae. 
[1] The Houston was owned and operated by petitioner Exxon Shipping Company, whose vessels carried crude oil for petitioner Exxon Company, U. S. A. We will refer to both of these companies as Exxon. The HIRI respondents are several affiliated corporations: Pacific Resources, Inc.; Hawaiian Independent Refinery, Inc.; PRI Marine, Inc.; and PRI International, Inc. (PRII).
[2] Some commentators have suggested that there may be a distinction between a system allocating damages on the basis of comparative culpability, and a system allocating damages on the basis of both comparative culpability and the degree to which fault proximately or foreseeably contributed to an injury. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts 474 (5th ed. 1984) (hereinafter Keeton); 1 T. Schoenbaum, Admiralty and Maritime Law  5-4, p. 167 (2d ed. 1994); Owen & Whitman, Fifteen Years Under Reliable Transfer: 1975ÔÇö 1990, Developments in American Maritime Law in Light of the Rule of Comparative Fault, 22 J. Mar. L. & Com. 445, 476-483 (1991). We continue to use the term "comparative fault" employed in Reliable Transfer, but we do not mean thereby to take a position on which of these systems is the appropriate one, assuming that there is in fact a distinction between them.
[3] Testimony by individuals is relevant, but hardly dispositive evidence of collective motivations. See n. 9, supra. It may be true that the most important concern motivating Senator Johnson, the Chairman of the Senate Districting Committee, was her desire to create the first Congressional District in the history of the State in which African-Americans were in the majority. Johnson never testified, however, that racial considerations were the sole concern motivating the changes to the shapes of the districts. See, e. g., App. 454-456 (certain areas that were minority communities were assigned to Anglo incumbents because of incumbent power), id., at 459 ("[J]ust as 30 went looking for friendly territory regardless of color, [the incumbents] went looking for friendly territory as well regardless of color"). Since this testimony was not only irrelevant to the  2 proceedings but arguably harmful to her claim there that racial considerations had been taken into account, these admissions are particularly telling.

To the extent that testimony of individual legislators is relevant, the following statements from the floor of the Texas House confirm that many legislators viewed these districts as political, not racial, gerrymanders: "This plan was drawn to protect incumbents. . . .
"[I]n order to protect an incumbent Dallas congressman and an incumbent Houston congressman, county lines were not respected, urban boundaries were not respected, precinct boundaries were not respected." Id., at 374-375 (statement of Rep. Ogden). "With the adoption of this plan, you will have 8 Republican Congressmen out of 30. That's de facto regression and provides for less Republican representation in Washington, D. C.
"Communities throughout the State are surgically split in what appears to be illogical, irrational and erratic pattern[s]. But if you look at election result data throughout the State, you'll find that these lines are very logical and very rational. The lines have been drawn, dissecting communities very creatively in order to pack Republicans and maximize Democratic representation." Id., at 376 (statement of Rep. Gusendorf). See also id., at 377-380 (statement of Rep. Gusendorf illustrating the gerrymandering process by reference to District 6, not a majority-minority district).
These gerrymanders "d[o] not have to happen. It has nothing to do with fairness. It has nothing to do with minority representation because if we were really concerned about minority representation, we would have drawn this map in such a way that the minorities were considered and not simply to elect Democrats." Id., at 384 (statement of Rep. Hill).
[23] It is ironic and slightly unfair for the plurality and District Court to use the State's  5 submission and Congresswoman Johnson's testimony in a  2 challenge to the congressional district as evidence against them in these cases. See, e. g., 861 F. Supp., at 1319-1321, 1338-1339; ante, at 969-970. Both of those proceedings required the State to assure the Attorney General and a federal court, respectively, that the State had adequately considered the interests of minority voters in the 1991 redistricting process. Under such circumstances, it is not at all surprising that the relevant declarant would limit his or her comments to the role that race played in the redistricting process, for other considerations were largely irrelevant (the District Court's opinion to the contrary notwithstanding, see 861 F. Supp., at 1339).
[24] As Justice Ginsburg noted in her dissent in Miller, "ethnicity itself can tie people together" in communities of interest.515 U. S., at 944; see alsoRogers v. Lodge, 458U. S. 613,651 (1982)(Stevens, J.,dissenting) ("Whenever identifiable groups in our society are disadvantaged, they will share common political interests and tend to vote as a `bloc' "). Furthermore, it may be that the very fact of racial bloc voting, a prerequisite to  2 liability, see Thornburg v. Gingles, 478 U. S. 30, 51 (1986) (and, under the Court's recent jurisprudence, to the voluntary formation of a majority-minority district), demonstrates the presence of a minority community. While communities based on race may merit a more skeptical review to ensure that a bond, rather than mere stereotyping, ties the community, see 861 F. Supp., at 1338, recognition of such a community in an electoral district certainly could, in certain circumstances, serve as a legitimate race-neutral explanation for particularly odd district shapes. By suggesting the contrary, I believe that the District Court erred. See ibid.; post, at 1060-1061 (Souter, J., dissenting).
[25] The District Court's legal analysis was probably flawed in part because its decision was issued before this Court announced its opinion in Miller. 
[26] While it may be that the political gerrymandering in this case is "different in degree" from that previously recognized, 861 F. Supp., at 1334, I do not believe that the reference in Shaw I and Miller to "traditional" districting principles, see Shaw I, 509 U. S., at 642; Miller, 515 U. S., at 916, was intended to prohibit a State from changing the process or policies underlying the complex negotiating process that is modern redistricting.
[27] The plurality expresses particular concern over the use of computer programs, particularly the availability of block-by-block racial data, and argues that the State's effort to "compil[e] detailed racial data," ante, at 967, is evidence of the controlling role of race in the computer-dominated process of redistricting. See ante, at 961-962; 861 F. Supp., at 1318-1319. It is worth noting, however, that the State made no particular "effort" to gather these data; it was included, along with similarly detailed information about sex, age, and income levels, in the data set provided by the Census Bureau and imported wholesale into the State's redistricting computers. Cf. Shaw, 861 F. Supp., at 457. Furthermore, even if the computer was used to fine tune the district lines to ensure that minority communities were included in District 30 (rather than individualized requests from candidates and their staffers on the basis of block-level data, see supra, at 1017-1018), such a technique amounts to little more than the use of a particularly efficient and accurate means of ensuring that the intended nature of the district was not undermined as incumbency protection forced it out of a compact district. I do not suggest that the end can always justify the means, but if those means are no more invidious than the end itself, I do not understand why their use should affect the analysis. I would not condemn state legislation merely because it was based on accurate information.
[28] "A prediction based on a racial characteristic is not necessarily more reliable than a prediction based on some other group characteristic. Nor, since a legislator's ultimate purpose in making the prediction is political in character, is it necessarily more invidious or benign than a prediction based on other group characteristics. In the line-drawing process, racial, religious, ethnic, and economic gerrymanders are all species of political gerrymanders." Mobile v. Bolden, 446 U. S. 55, 88 (1980) (Stevens, J., concurring in judgment) (footnote omitted).

To the extent that a political prediction based on race is incorrect, the voters have an entirely obvious way to ensure that such irrationality is not relied upon in the future: Vote for a different party. A legislator relying on racial demographics to ensure his or her election will learn a swift lesson if the presumptions upon which that reliance was based are incorrect.
[29] I find it particularly ironic that the Court considers the use of race verboten in this benign context, while the Court just recently, on the basis of evidence that, inter alia, "[m]ore than 90% of the persons sentenced in 1994 for crack cocaine trafficking were black," dismissed out of hand the Ninth Circuit's assumption that "people of all races commit all types of crimes." United States v. Armstrong, ante, at 469. The Ninth Circuit's conclusion, it seems to me, is a model of the sort of race-neutral decisionmaking that this Court insists should be a part of constitutional decisionmaking processes.
[30] Although I conclude that no reasonable interpretation of the record would require the application of strict scrutiny to District 30, I believe for the reasons that follow that it, too, would survive strict scrutiny if it were to be subject to that level of review.
[31] While I believe that the evidence supporting the State's conclusions in this regard is stronger than that suggested by the plurality or Justice Kennedy in his concurring opinion, I will simply assume, arguendo, as the plurality does, that the State had a reasonable fear of liability under  2. See also supra, at 1007.
[32] Even if the Court in Shaw II is correct in asserting that North Carolina's District 12 would not have allowed the State to avoid liability under  2, see ante, at 916-918, no such plausible argument could be made in these cases. The core of District 30, for instance, contains more than half of all the African-American population in the district, and coincides precisely with the heart of the compact community that the State reasonably believes would give rise to a  2 violation were it not placed in a majorityminority district. The same facts are true with respect to the Houston districts.
[33] The difficulty of balancing between these competing legal requirements will only be exacerbated by the ability of litigants (and courts) to use evidence proffered in defense by the State or its actors in one context as evidence against the State in another. See n. 24, supra. While there is nothing wrong with using prior inconsistent statements (to the extent that they really are inconsistent), States will be all the more unwilling to enter into the process at all given the certainty that they will be subject to suits in which evidence offered in one as defense will be fodder for the plaintiffs in another.
[34] The contrary is also possible, of course. Perhaps the burgeoning role of federal courts in this process, along with their relative isolation from the political pressures that motivate legislatures to bend district lines, will mean that there will actually be fewer politically gerrymandered districts. Regardless of whether political gerrymanders are more or less prevalent after our decisions today, my point is the same: The Court has its hierarchy of values upside down.
[35] My view that a State may act unconstitutionally by gerrymandering to minimize the influence of a group on the political process is consistent with the belief that there is no constitutional error in the drawing of district lines based on benign racial considerations. As Justice Powell noted in his opinion in Davis v. Bandemer, 478 U. S., at 165, there is a sharp distinction between "gerrymandering in the `loose' sense" (i. e., the drawing of district lines to advance general political and social goals), and "gerrymandering that amounts to unconstitutional discrimination" (i. e., the drawing of district lines for the sole purpose of "`occupy[ing] a position of strength at a particular time, or to disadvantage a politically weak segment of the community,' " id., at 164 (citing Karcher, 462 U. S., at 748 (Stevens, J., concurring)). See also 478 U. S., at 125, n. 9 ("[A] preference for nonpartisan as opposed to partisan gerrymanders . . . merely recognizes that nonpartisan gerrymanders in fact are aimed at guaranteeing rather than infringing fair group representation"). While I believe that allegations of discriminatory intent and impact, if proved, should give rise to a constitutional violation, Shaw, Miller, and these cases all involve allegations of both impact and intent that are far more diffuse than the allegations to which we have traditionally directed our most rigorous review. See Shaw II, ante, at 921-923 (Stevens, J., dissenting); cf. Gomillion v. Lightfoot, 364 U. S. 339 (1960). Limiting the constitutional ban on gerrymandering to those claims alleging that a specific group (as opposed to every group) has been harmed would be far more consistent with prior precedent than the Court's still-developing jurisprudence of racial gerrymandering.
[36] Compare 51 Congressional Quarterly 10 (1993) (list of AfricanAmericans who have served in Congress through the end of 1992) and Supplement to 52 Congressional Quarterly 10 (Nov. 12, 1994) (listing minorities in the 104th Congress) with biyearly publications of The Almanac of American Politics (published 1975-present).
[37] D. Bositis, Joint Center for Political and Economic Studies, AfricanAmericans & the 1994 Midterms 22 (rev. May 1995). Fifteen black candidates ran for office in majority-white districts. Ibid. 
[38] See, e. g., Growe v. Emison, 507 U. S. 25, 34 (1993) ("[T]he Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts") (citing U. S. Const., Art. I,  2); Voinovich v. Quilter, 507 U. S. 146, 156 (1993); Reynolds v. Sims, 377 U. S. 533, 586 (1964).
[1] Even in the no longer controversial instance of the one-person, onevote rule, the adequacy of justification and standard was subject to sharp dispute, and some of the Court's best minds expressed principled hesitation to go even this far into what has been called the political thicket, see id., at 615 (Harlan, J., dissenting) ("The Court's elaboration of its new `constitutional' doctrine indicates how farÔÇöand how unwiselyÔÇöit has strayed from the appropriate bounds of its authority. The consequence of today's decision is that in all but the handful of States which may already satisfy the new requirements the local District Court or, it may be, the state courts, are given blanket authority and the constitutional duty to supervise apportionment of the State Legislatures. It is difficult to imagine a more intolerable and inappropriate interference by the judiciary with the independent legislatures of the States"); Baker v. Carr, 369 U. S. 186, 267 (1962) (Frankfurter, J., dissenting) ("The Court's authorityÔÇö possessed of neither the purse nor the swordÔÇöultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment, in fact and in appearance, from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements").
[2] As Professor Issacharoff notes, our vote-dilution cases acknowledged that "the right to cast an effective ballot implied more than simply the equal weighting of all votes . . . . To be effective, a voter's ballot must stand a meaningful chance of effective aggregation with those of likeminded voters to claim a just share of electoral results. For this reason, any sophisticated right to genuinely meaningful electoral participation must be evaluated and measured as a group right . . . ." Issacharoff, Groups and the Right to Vote, 44 Emory L. J. 869, 883 (1995); see also Davidson, The Recent Revolution in Voting Rights Law Affecting Racial and Language Minorities, in Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990, p. 23 (C. Davidson & B. Grofman eds. 1994) ("Ethnic or racial vote dilution takes place when a majority of voters, by bloc voting for its candidates in a series of elections, systematically prevents an ethnic minority from electing most or all of its preferred candidates . . . . Vote dilution not only can deprive minority voters of the important symbolic achievement of being represented by preferred members of their own group, it can deprive them of a committed advocate in councils of government . . . [and] of the substantial benefits that government bestows . . .").
[3] See Pildes, The Politics of Race, 108 Harv. L. Rev. 1359, 1369 (1995) (reviewing Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990 (C. Davidson & B. Grofman eds. 1994)) (noting that studies of Southern States demonstrate that, as a result of racial-bloc voting, "the probability of a district's electing a Black representative was less than 1% regardless of a district's median family income, its percentage of high school graduates; its proportion of residents who were elderly, urban, foreign-born, or who had been residents of the state for more than five years; or the region of the country in which the district was located"); id., at 1375 (finding similar results nationwide). There is, of course, reason to hope that conditions are improving. See infra, at 1076 (discussing elections in which crossover voting favors minority incumbents and in which racial issues have not played a significant role in the outcome). As I discuss in detail in Part IV, infra, I believe that these improvements may be attributed in large part to the effect of the Voting Rights Act, and thus to our willingness to allow race-conscious districting in certain situations.
[4] I recognize, of course, that elsewhere we have imposed prohibitions on the consideration of race, but contexts are crucial in determining how we define "equal opportunity." Consider our decisions on peremptory jury challenges. There, as in politics, one race may not have had a fair shake from the other. But the differences between jury decisionmaking and political decisionmaking are, I believe, important ones. Politics includes choices between different sets of social values, choices that may ultimately turn on the ability of a particular group to enforce its demands through the ballot box. Jury decisionmaking is defined as a neutral process, the impartial application of law to a set of objectively discovered facts. To require racial balance in jury selection would risk redefining the jury's role. Without denying the possibility that race, especially as an imperfect proxy for experience, makes a difference in jury decisionmaking (and, in some cases, legitimately so), it seems to me that the better course is to ensure a fair shake by denying each side the right to make race-based selections. The cost of the alternative is simply too great. It is an entirely different matter, however, to recognize that racial groups, like all other groups, play a real and legitimate role in political decisionmaking. It involves nothing more than an acknowledgment of the reality that our concepts of common interest, geography, and personal allegiances are in many places simply too bound up with race to deny some room for a theory of representative democracy allowing for the consideration of racially conceived interests. A majority of the Court has never disagreed in principle with this position. See, e. g., Shaw I, 509 U. S. 630, 642 (1993) (noting that race-conscious redistricting is not always unconstitutional); Miller v. Johnson, 515 U. S. 900, 928-929 (1995) (O'Connor, J., concurring) (consideration of race in the redistricting process does not always violate the Constitution); ante, at 958 (opinion of O'Connor, J.) (noting that strict scrutiny does "not apply merely because redistricting is performed with consciousness of race").
[5] Leaving aside the question whether such a catholic injury can be a violation of the Equal Protection Clause, there still might be a use of race that harms all district voters because it is used to an unreasonable degree. But see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U. S. 464, 489 (1982). But the Court has never succeeded in identifying how much is too much, having adopted a "predominant purpose" test that amounts to a practical repudiation of any hope of devising a workable standard. See Part IÔÇöC, infra. 
[6] See Cannon v. North Carolina State Bd. of Ed., 917 F. Supp. 387, 391 (EDNC 1996) (describing this "difficult area of the law" and predicting that it will"gain better definition by reason of an imminent decision by the Supreme Court of the United States [in Shaw II ]");Briffault, Race and Representation After Miller v. Johnson, 1995 U. Chi. Legal Forum 23, 50 (1995) ("[I]t is unclear what work the adjectives `predominant' and `overriding' do in the Supreme Court's test"); Karlan, Post-Shaw Era 287 (Miller "further unsettled the already unclear roadmap" of Shaw I ); Issacharoff, Constitutional Contours 60 ("[T]he Court's facile reliance on standards of causation vaguely reminiscent of tort law does nothing to defer confronting the hard issue of acceptable standards of conduct").
[7] Even in areas where there is no racial-bloc voting, the application of certain traditional districting principles may involve a legitimate consideration of race.
[8] See Karst, Paths to Belonging: The Constitution and Cultural Identity, 64 N. C. L. Rev. 303, 347, 350 (1986) ("[T]he surest path to assimilation is participation in the larger society's activities and institutions. Voting is not just an expression of political preferences; it is an assertion of belonging to a political community. . . ." "When legislative districts are defined in ways that exclude the possibility of significant minority representation, potential minority voters see that their votes are not worth casting. Yet electoral mobilization is vital . . . to the group members' perceptions that they belong to the community"); Walzer, Pluralism in Political Perspective, in The Politics of Ethnicity 1, 18 (S. Thernstrom, A. Orlov, & O. Handlin eds. 1982) ("[P]olitical life is in principle open, and this openness has served to diffuse the most radical forms of ethnic competition"); Kantowicz, Voting and Parties, in The Politics of Ethnicity, supra, at 29, 45 (noting that political successes and recognition made members of an ethnic group "feel that it belonged in the wider society . . . [and brought] them inside the political system"); Mintz, Ethnicity and Leadership: An Afterword, in Ethnic Leadership in America 198 (J. Higham ed. 1978) (concluding after reviewing several studies of ethnic politics that "we ignore at our peril the need to understand those processes by which being shortchanged . . . politically can become any group's motto or battle standard"); cf. Karlan, Our Separatism 102 ("two generations of communist suppression and ethnic and religious tension in Yugoslavia did little to ensure stability, tolerance, or integration").
[9] See, e. g., Nolan, Boston Mayoral Race Could Break Dominance of Ethnicity, Boston Globe, Apr. 9, 1993, p. 40 ("When Boston finishes choosing a new mayor, the city may discover that after centuries of immigration, ethnicity is no longer the dominant factor in its politics"); Black, OnceSolid Voting Blocks are Splitting in Boston, Boston Globe, Nov. 1, 1993, p. 1 (commenting that voters consider Menino's Italian descent "little more than a historical footnote" and observing that "ethnic voting has faded . . . [a]s various groups enter the American economic and social mainstream. . . [and] gain some semblance of [political] power"); D'Innocenzo, Gulotta Can't Count on Ethnicity, Newsday, Oct. 19, 1993, p. 97 (noting that "[t]he vowel at the end of Tom Gulotta's name may not matter in this year's county executive election as it once did" because "Italian-Americans in Nassau County are likely to go to the polls with more than ethnic favoritism in mind"; attributing the decline in ethnicity-based voting to the fact that "Nassau Italian-Americans feel less marginali[zed] as an ethnic group").