**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 02-2324**

---

RCSH OPERATIONS, L.L.C., a Louisiana Limited
Liability Company,

Plaintiff - Appellant,

versus

THIRD CRYSTAL PARK ASSOCIATES LIMITED
PARTNERSHIP, a Virginia Limited Partnership;
CHARLES E. SMITH MANAGEMENT, INCORPORATED, a
District of Columbia Corporation; CESC PARK
THREE LAND, LLC, a Virginia Limited Liability
Company; CESC PARK THREE MANAGER, LLC, a
Virginia Limited Liability Company,

Defendants - Appellees.

---

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.  Gerald Bruce Lee, District
Judge; T. S. Ellis, III, District Judge.  (CA-02-173-A)

---

Argued:  October 30, 2003           Decided:  November 16, 2004

---

Before WILKINSON and TRAXLER, Circuit Judges, and Robert E. PAYNE,
United States District Judge for the Eastern District of Virginia,
sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Vernon Webster Johnson, III, JACKSON & CAMPBELL, P.C.,
Washington, D.C., for Appellant.  John Henry Carstens, JORDAN,
COYNE & SAVITS, L.L.P., Fairfax, Virginia, for Appellees.  **ON
BRIEF:** Russell S. Drazin, JACKSON & CAMPBELL, P.C., Washington,

D.C., for Appellant.  Melissa A. Zeller, JORDAN, COYNE & SAVITS, L.L.P., Fairfax, Virginia, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

RCSH Operations, L.L.C. ("RCSH") appeals from an award of summary judgment dismissing its breach of contract and negligence claims against the defendants, Third Crystal Park Associates Limited Partnership ("TCP"), Charles E. Smith Management, Inc., CESC Park Three Land, LLC, and CESC Park Three Manager, LLC, and from a judgment, following a bench trial, in favor of TCP on its counterclaim against RCSH for breach of contract. For the reasons set forth below, we affirm both the entry of summary judgment in TCP's favor on RCSH's claims and the entry of judgment in favor of TCP on its counterclaim.

I.

In 1993, TCP and Prime L.L.C. ("Prime") entered into a commercial lease agreement (the "Lease") by which Prime leased space on the eleventh floor of a building owned by TCP. From then until August 1998, Prime operated a franchised Ruth's Chris Steak House restaurant in the leased premises.[1] In August 1998, the franchise restaurant was purchased from Prime by Ruth's Chris Steak House #28, Inc. ("RC #28"), a corporate subsidiary of Ruth U. Fertel, Inc., then the parent corporation of the Ruth's Chris Steak House organization. Also, in August 1998, RC #28 assumed the Lease

_____

[1] Before Prime leased the premises for use as a Ruth's Chris restaurant, the premises had previously been leased to another entity for use as a restaurant.

3

from Prime and thereafter operated the Ruth's Chris restaurant under the Lease until March 2001 when RC #28 was merged into RCSH, which assumed the Lease. Pursuant to the merger agreement, RC #28 ceased to exist.

This action arises out of plumbing problems at the restaurant in 1999 while RC #28 was the tenant. The principal drain line for the restaurant is a five inch drain (the "5" line") that runs vertically and horizontally in a zig-zag pattern as it wends its way down and across the building from the eleventh floor to the sewer connection that is located in the basement. The 5" line and other drains in the restaurant that lead to the 5" line, became clogged, resulting in flooding on the eleventh floor and four lower floors in the building. The restaurant was damaged and so too were an adjacent tenancy on the eleventh floor, as well as other tenancies on the first, second, third and fifth floors. Extensive cleaning and repair of the restaurant was required and, while that was underway, the restaurant was closed. According to the complaint, RC #28 incurred approximately $355,000 in direct repair costs, and it suffered approximately $1.15 million in lost profits while the restaurant was closed from January 3, 2000 to April 3, 2000.

TCP also incurred expenses in its emergency response to the flooding in the restaurant, in the adjacent tenancy on the eleventh floor, and in the tenancies on the four lower floors. TCP also

4

incurred expenses to repair flood damage to the restaurant and other tenant spaces. According to TCP, it paid $110,372.14 to various contractors and its property manager in order to respond to the emergency and to remedy the damage caused by the flooding.

Although RC #28 was the tenant at the time of the flooding in the summer of 1999, it ceased to exist after its merger into RCSH in 2001 and thus RCSH instituted this action, as RC #28's successor in interest. The complaint asserted claims for breach of contract (Count I), negligence (Count II), and conspiracy to injure another's trade reputation and business (Count III). TCP filed a counterclaim against RCSH, seeking to recover the expense that it had incurred in responding to the emergency and in repairing damage to the other tenancies and the drain lines.

Count III was dismissed early in the proceedings, and it is not at issue in this appeal. Following the close of discovery, the district court granted summary judgment in favor of all defendants against RCSH on its breach of contract and negligence claims. Thereafter, a pretrial conference was held and the case was set for jury trial. Approximately a week later, TCP moved to strike RCSH's request for a jury trial on the ground that the parties had waived their right to jury trial under Section 47 of the Lease. The district court granted that motion, and TCP's counterclaim was

tried to the court sitting without a jury, after which a judgment was entered in TCP's favor in the amount of $110,372.14.[2]

## II.

We review <u>de novo</u> the district court's grant of summary judgment, <u>Inova Alexandria Hosp. V. Shalala</u>, 244 F.3d 342, 349 (4th Cir. 2001). That includes a <u>de novo</u> assessment of the legal issue whether the Lease was ambiguous. <u>Moore Bros. Co. V. Brown & Root, Inc.</u>, 207 F.3d 717, 722 (4th Cir. 2000).

Section 7 of the Lease, "REPAIRS AND MAINTENANCE," provides, in pertinent part, that the "[t]enant shall at its own expense make all repairs to the interior of the Demised Premises. . . ." (JA 67). Section 49, entitled "TENANT REPAIRS AND MAINTENANCE" amends Section 7, by inserting immediately after the foregoing quoted text, the provision that: "[t]enant shall also maintain and repair all drain lines, grease traps, conduits, ducts and other facilities in the Building which are dedicated to serving the equipment in the Demised Premises."[3] (JA 85).

---

[2] United States District Judge Gerald Bruce Lee decided the summary judgment motions and the motion to strike RCSH's demand for jury trial. United States District Judge T.S. Ellis, III tried the counterclaim and entered judgment on it.

[3] Section 49 adds several other provisions for insertion into Section 7 at this point, but none of them are pertinent to resolution of the issues presented in this appeal.

In 1999, the 5" line and other drain lines that connected to it became clogged.  Those lines were dedicated solely to service the restaurant.  The 5" line received kitchen waste and sewage from the bathrooms in the restaurant and then carried the combined waste through the building to the county's sewer line with which the 5" line connected at the garage level of the TCP building.

The record also reflects that, in 1995, when Prime was operating a franchised Ruth's Chris Steak House restaurant in the leased premises, the restaurant experienced two flooding problems in the 5" line and that, consequently, an outside plumbing company was called upon to unclog the drain lines.  The plumbing company used electrical "snaking" equipment and completely cleared the line.  Also, in 1995, the plumbing company installed special "clean-outs" so that future maintenance of the line would be easier, and advised that the 5" line should be "snaked" regularly.

Roger Pastore, an experienced restaurant manager, became general manager of the restaurant in January 1997, and he was aware of the need to maintain the drain lines that served the restaurant. In fact, in 1997, TCP's property management company reminded Pastore that maintenance of the 5" line was the restaurant's responsibility under the Lease, (JA 517; 266), and Pastore passed this along to corporate headquarters.  The plumber, who had "snaked" the line in 1995, returned to clean the line in the summer of 1997.  He observed that the condition of the 5" line was worse

7

than it had been in 1995 and concluded that the line did not appear to have been cleaned since 1995. Nonetheless, and notwithstanding that the line was completely clogged, the plumber, using the same procedure followed in 1995, was able to clear out the entire line once again. From the record, it appears that no "snaking" or other cleaning was performed between the summer of 1997 and the summer of 1999 when the flooding that gave rise to this action occurred.

The district court held that the applicable provisions of the Lease (Sections 7 and 49) unambiguously placed responsibility for maintaining and repairing the drain pipes on the tenant. Finding no dispute respecting whether the 5" line and the connected lines served only the restaurant, and rejecting the contention of RCSH that the language at issue was ambiguous, the district court held that, "because the only reasonable construction and the plain and unambiguous meaning of Paragraph 49 allocates the maintenance and repair responsibilities of the drain lines at issue to the Plaintiff-Tenant, Defendants had no obligation to maintain the drain lines and therefore did not breach the [Lease]." (JA 335).

As it did in the district court, RCSH argues here that Section 49 is ambiguous because it does not define the term "equipment." From that point of departure, RCSH argues that the toilet facilities which drain into the 5" line were, under property law, generally regarded as "improvements," not "equipment," and that,

8

therefore, the 5" line at issue was not "dedicated to serving the equipment in the Demised Premises."

Mindful that the undisputed record was that the sewage from the toilets in the restaurant and the waste from the kitchen both are carried away from the restaurant by the 5" line and that the 5" line and the connected lines served only the restaurant, the district court rejected RCSH's argument because:

> The five inch drain line at issue served only the Plaintiff-Tenant's restaurant. Reading the Lease as a whole, the only logical construction of Paragraph 49 is that the tenant is responsible for maintenance of the drains and drain lines that serve the restaurant's equipment but do not serve the equipment of other tenants. Plaintiff's construction of Paragraph 49 would read the 'drain line . . . dedicated to serving the equipment in the Demised Premises' language right out of the [Lease].

We agree with the district court that the Lease does not make a property law-based distinction between "equipment" and "improvements." Instead, given its plain meaning, the text of Section 49 simply obligates the tenant to maintain and repair those drain lines that serve its facilities, as opposed to the facilities of other tenants. We also agree that RCSH's interpretation of the Lease is so cramped as to render Section 49, an important part of the Lease, a nullity.

In this diversity case, the district court was obligated to apply the law of Virginia, the forum state. The Supreme Court of Virginia has spoken to the issues here presented in TM Delmarva

9

Power, L.L.C. v. NCP of Va., L.L.C., 557 S.E.2d 199, 200 (Va. 2002) wherein the court held that:

> A contract is not ambiguous merely because the parties disagree as to the meaning of the terms used. Furthermore, contracts must be considered as a whole 'without giving emphasis to isolated terms.' Finally, no word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and the parties are presumed not to have included needless words in the contract.

Id. at 200 (citations omitted). The attempt of RCSH to create ambiguity in the Lease runs afoul of these basic precepts because it wrenches the words "dedicated" and "equipment" out of their context and, in so doing, treats what is a highly relevant contract amendment as devoid of purpose.

For the foregoing reasons, we affirm the decision of the district court to grant summary judgment on Count I, RCSH's breach of contract claim.[4]

---

[4] RCSH alleged that there was an oral agreement in 1997, pursuant to which RCSH agreed to increase the frequency of its maintenance of the 5" line to twice annual cleanings and the defendant, TCP, agreed to pay for property damage associated with the flooding of the 5" line. This alleged oral modification of the Lease is barred by the provision of the Lease in Section 24 which prohibits modification of the Lease except "in writing, signed by the parties hereto." The district court properly applied Section 24 to bar any oral modification of the Lease.

10

The district court also granted summary judgment on RCSH's negligence claim which was predicated on the theory that the defendants owed a number of common law duties not governed "solely by virtue of the contractual relationships between the parties," which the defendants negligently failed to fulfill. (JA 19) In the view of RCSH, "[t]he leakage, flooding and related damage to the Restaurant would not have occurred but for the Defendants' negligent failure to 'fulfill' the duties." The district court rejected that contention, holding that:

> Plaintiff's negligence claim fails for one simple reason. Though Plaintiff argues at great length that Virginia and other jurisdictions recognize common law duties in some cases where a commercial lease exists, it fails to set forth any evidence showing a specific common law duty that the Defendants breached in this case.

(JA 337)

It is true that, in the complaint, RCSH cataloged ten duties which the defendants supposedly had breached. However, by the time of summary judgment, none of those duties was tethered to any factual base other than the maintenance of the 5" line and the lines connected to it which, as outlined in Section II above, was a duty that, by contract, the parties had allocated to the tenant. Thus, after discovery, and at the time of summary judgment, the negligence claim was nothing more than a recasting of the breach of contract claim in negligence terms. And, the only duty that

11

allegedly was breached by the defendants was the putative duty to maintain the 5" line and the connected lines.

Although, under Virginia law, a negligence claim conceivably can exist in tandem with a breach of contract claim, that is so only if the negligence claim is based on the breach of some duty that is independent of the contract. A&E Supply Co. v. Nationwide Mutual Fire Ins. Co., 798 F.2d 669, 671-72 (4th Cir. 1986) (citing Kamlar Corp. V. Haley, 229 S.E.2d 514, 517 (Va. 1983)). It is the responsibility of the nonmoving party to identify the existence of a specific, independent duty that was breached. As the district court correctly held, RCSH failed to discharge that fundamental responsibility demanded of it by now well-settled summary judgment jurisprudence.

Instead, RCSH relied principally on a string of premises liability cases which, as the district court correctly held, had no applicability in this case in which the issue is: upon which party did the Lease place the obligation to maintain the 5" line and the connected drain lines that served the restaurant. Also, RCSH cited: (1) a number of inapplicable cases addressed to the obligation of landlords to protect business invitees from personal injury, a circumstance not here at issue; (2) a case decided under the 1974 Virginia Residential Landlord Tenant Act, a statute that does not apply to commercial leases (Va. Code Ann. §§ 55-248.2 to 28.40); and (3) decisions involving the Uniform Statewide Building

12

Code (Va. Code §§ 36-97 to 36-119.1) which, absent contractual provisions to the contrary, places repair and maintenance of a building upon the owner, a fact pattern that did not exist here. On the facts presented by this record, the district court correctly concluded that these decisions and statutes had no applicability in this case.

Finally, RCSH argued that the tenant did not have access to, or control over, the entire length of the 5" line and that, therefore, notwithstanding the language of the Lease that specifically allocated maintenance of that line to the tenant, the responsibility really remained with TCP. There are two flaws in that theory. First, the record is replete with evidence that, at least in 1995 and 1997, TCP afforded the tenant's plumbing contractor access to all areas necessary to clear the clogged 5" line from the restaurant all the way to the point where the line connected with the sewer (e.g. across and down the entire building). Second, perhaps as a function of the foregoing, and, as held by the district court, "[P]laintiff does not come forward with any evidence that Defendants denied access to Plaintiff or Plaintiff's contractor to maintain the drain line pursuant to the Lease." (JA 338). We agree that, in opposing the entry of summary judgment, RCSH offered no factual support for its assertion that the tenant was denied the access necessary to discharge the

13

maintenance obligation imposed on it by Sections 7 and 49 of the Lease.[5]

For the foregoing reasons, we affirm the grant of summary judgment on Count II, RCSH's negligence claim.[6]

IV.

TCP filed a counterclaim against RCSH alleging that the failure of the tenant to perform inspections, repairs and maintenance necessary to keep the drain lines that were dedicated to serving the restaurant in good working order was a breach of the Lease and that, as a direct and proximate cause of the breach, the pipes burst, causing flooding in the building, the consequence of which was the damage sustained by TCP. The counterclaim was tried to the district court sitting without a jury.

To recover on its counterclaim, TCP was obligated to prove, by a preponderance of the evidence, that a material breach of the Lease on the part of the tenant was the proximate cause of the damage of which TCP complains. The district court held that TCP

---

[5] RCSH also seems to argue that RC #28, the tenant, was unaware of the existence of some of the connected lines. That, of course, is no excuse because the Lease requires the tenant to maintain and repair all drains dedicated to serving the leased premises.

[6] Given this resolution, it is unnecessary to address TCP's argument that the negligence claim fails under Virginia's economic loss rule.

had met its burden and entered judgment on the counterclaim.  RCSH appeals from that judgment.

We begin by noting that, as explained above in Section II, the Lease imposes upon the tenant the obligation to "maintain and repair all drain lines, grease traps, conduits, ducts and other facilities in the building which are dedicated to serving the equipment in the Demised Premises."  The district court found, as facts, that the drain lines at issue were dedicated to serving the kitchen and bathroom facilities  in the restaurant; that the drain lines had not been maintained by the tenant; and that the failure to maintain the drain lines proximately caused the drain lines to rupture and to release waste and sewage into the restaurant and other tenant spaces.  The district court also held, as a fact, that TCP consequently had incurred reasonable necessary expenses in the amount of $110,372.14 to address the emergency flooding and to remediate the damage caused by the tenant's breach of the Lease.

RCSH presents four reasons why the district court's entry of judgment in favor of TCP on the counterclaim was error.  We consider each in turn.

A.   The Assumption and Assignment Agreement

The district court held that RCSH was the successor in interest to RC #28 and thus was liable by virtue of Sections 19 and 34.2 of the Lease for the acts and omissions of RC #28 while it was the tenant.  RCSH does not dispute that it is the successor in

15

interest under the Lease to RC #28.[7]  Nor does RCSH dispute that Section 19 of the Lease devolves the liabilities of RC #28 upon RCSH when it provides that "[a]ll rights, remedies and liabilities herein given to or imposed upon either of the parties hereto, shall extend to their respective heirs, executors, administrators, successors, and assigns."  And, RCSH agrees that Section 34.2 of the Lease permits the tenant to assign its rights to:

> Ruth U. Fertel, Inc. or any entity or individual designed by Ruth U. Fertel, Inc., so long as (1) such assignee expressly assumes in writing all the obligations of Tenant under this Lease . . . and (2) Ruth U. Fertel, Inc. unconditionally guarantees the obligations of such assignee for the balance of the term of this Lease (and any extensions) . . .

(JA 76)

It also is undisputed that, in March 2001, by virtue of an Assignment and Assumption of Lease Agreement ("Assignment Agreement"), RC #28 assigned its rights under the Lease to RCSH, a subsidiary of, and an entity that was approved by, Ruth U. Fertel,

---

[7] Nor could RCSH dispute that finding, given that, in its complaint, RCSH affirmatively asserted that it was "successor in interest to [RC #28]" and that, as such, it was the proper party to sue on the Lease.  Complaint, ¶1, (JA 13-14).  Moreover, RCSH's complaint also describes RC #28 as RCSH's predecessor in interest which incurred the very damages (repair expense and lost profits) that RCSH sought to recover in its complaint.

16

Inc.[8]   Under paragraph 2 of the Assignment Agreement, RCSH, as assignee of RC #28:

> agrees to pay, perform and fully discharge, in accordance with their respective terms, the payment and performance, liabilities and obligations of Assignor [RC #28] arising out of the Lease after the date hereof. Assignee does not assume or agree to pay any liabilities or obligations under the Lease arising prior to the date hereof.

(JA 105). Acting through its property manager, TCP consented to the assignment. (JA 108)

According to RCSH, TCP waived the rights it had under Sections 19 and 34.2 of the Lease to recover from RCSH, as successor in interest to RC #28, for any breach of the Lease by RC #28 because TCP consented to the Assignment Agreement which provided that RCSH did "not assume or agree to pay any liabilities obligations under the Lease arising prior to the date hereof." The district court rejected RCSH's waiver argument for a number of reasons, (JA 1267-74) the first of which was that RCSH did not plead the affirmative defense of waiver in its answer to the counterclaim. (JA 1270)

Under Fed. R. Civ. P. 8(c), "a party shall set forth affirmatively . . . waiver, and any other matter constituting an avoidance or affirmative defense." It is settled that a failure to raise an affirmative defense in the appropriate pleading results in

---

[8] By the time of the Assignment Agreement, Ruth U. Fertel, Inc. had become Ruth's Chris Steak House, Inc., and RCSH was a wholly owned subsidiary of that entity. (JA 105-111).

17

the loss of that defense.  Brinkley v. Harbor Recreation Club, 180 F.3d 598, 612 (4th Cir. 1999); Peterson v. Air Line Pilots Assoc. Intl, 795 F.2d 1161, 1164 (4th Cir. 1985).  It is beyond question that RCSH did not plead in its answer to the counterclaim, waiver, by virtue of paragraph 2 of the Assignment Agreement or otherwise.[9] However, even if a party fails to plead an affirmative defense, the opposing party still must show "prejudice or unfair surprise" before the waiver will be enforced.  Brinkley v. Harbor Recreation Club, 180 F.3d at 612; Peterson v. Air Line Pilots Assoc. Intl, 759 F.2d at 1164.  The district court held that TCP was prejudiced because the failure of RCSH to plead the waiver defense disabled TCP from discovering, or presenting evidence about, the topic of waiver.

The record does not show exactly when the issue of waiver first surfaced, but it clearly was not pleaded as an affirmative defense to the counterclaim.  The first mention of the topic in the record was in the proposed findings of fact and conclusions of law that both parties filed on Friday, August 23, 2002, two days before the trial began on Monday, August 26, 2002.  (JA 340-357).  On the morning of trial, TCP took the position that waiver had not been

_____

[9] Because the assignment provision contradicts the Lease and was not accompanied by consideration that would be necessary to effect a modification of the Lease, the consent to the Assignment Agreement, including paragraph 2, is properly categorized as a waiver of Sections 19 and 34.2 of the Lease.  RCSH does not contest that characterization.

18

pleaded as an affirmative defense. (JA 673-74). RCSH did not contend otherwise, and, although, in opening statement, RCSH pointed to paragraph 2 of the Assignment Agreement, it did so in context of discussing the topic of successor liability, not the topic of a waiver of the provisions of Sections 19 and 34.2 of the Lease (JA 687-89). And, even then RCSH's counsel stated that the successor liability issue had "just come up." (JA 689). Nonetheless, in its post-trial brief in support of a motion for a judgment as a matter of law, RCSH argued that paragraph 2 of the Assignment Agreement was a contractual waiver that foreclosed imposition of liability on RCSH as a successor in interest under the Lease provisions. (JA 1093-94). And, in its post-trial brief, TCP continued to press the point that RCSH had not pleaded waiver as an affirmative defense. (JA 1110-12; 1133-37).

The district court held that the waiver defense had not been pleaded and that TCP had been prejudiced by the failure to plead it. In so doing, the district court held: (1) that "TCP did not have . . . fair warning that it was going to have to confront a waiver, a timely waiver defense. . . . (JA 1271); and (2) that, if it had received notice of the waiver defense, TCP would have presented two exhibits that "strike, I think, a fatal blow to a waiver claim, both on prejudice grounds and on other grounds." (JA 1271).

19

That reference was to a letter that attended TCP's consent to the Assignment Agreement.  Both documents refuted paragraph 2 of the Assignment Agreement.  The letter, which was addressed to TCP, stated that:

> The purpose of this letter is to advise that Ruth U. Fertel, Inc. The parent company and sole shareholder of Ruth's Chris Steak House #28, Inc. ("Tenant"), has changed its name to 'Ruth's Chris Steak House, Inc.'  The name change of Ruth U. Fertel, Inc. to Ruth's Chris Steak House, Inc. is nominal and cosmetic only, and the ownership of Ruth U. Fertel, Inc. and the Tenant is not changing in any way whatsoever.
>
> In addition, all of the wholly owned subsidiaries of Ruth's Chris Steak House, Inc. (formerly Ruth U. Fertel, Inc.) are being restructured and merged for internal operational purposes only.  As a result of this restructuring, the Tenant, Ruth's Chris Steak House #28, Inc., will be merged with several other wholly owned subsidiaries of the parent into the newly created Louisiana limited liability company known as 'RCSH Operations, LLC.'  The sole owner, member and manager of RCSH Operations, LLC is Ruth's Chris Steak House, Inc. (formerly Ruth U. Fertel, Inc).
>
> As an accommodation to Tenant and Ruth's Chris Steak House, Inc. (formerly Ruth U. Fertel, Inc.) and in light of our good working relationship, we ask that you, as 'Landlor/Intervenor,' execute the attached Assignment and Assumption of Lease Agreement acknowledging the restructuring and renaming of Tenant to RCSH Operations, LLC; and the Assignment of Tenant's interests and obligations in the Lease to RCSH Operations, LLC.

20

(JA 1141) emphasis added. The merger agreement explicitly provided, in paragraph 2.05, that RCSH "shall be responsible for all of the liabilities and obligations of" RC #28. (JA 1147).

The district court held that, if waiver by virtue of paragraph 2 of the Assignment Agreement had been pleaded, TCP could have introduced evidence respecting the letter from RCSH to TCP explaining that the change in corporate structure was a cosmetic one, that ownership of the restaurant would remain the same, and that the tenant would be not changing in any way. Also, TCP could have shown that RC #28 would be merged into the newly created RCSH and that this merger was occurring "for internal purposes only." Further, TCP could have offered evidence that the merger agreement provided that RC #28 would cease to exist and that the surviving company, RCSH, would "be responsible for all of the liabilities and obligations of corporation A [RC #28]."

That kind of evidence would have been highly probative of the effect, if any, of TCP's consent to the Assignment Agreement and the effect, if any, of paragraph 2 of the Assignment Agreement on the provisions of Sections 19 and 34.2 of the Lease. Undoubtedly, the failure to plead waiver as an affirmative defense prejudiced TCP because TCP did not pursue in discovery, and thus did not offer at trial, proof that the consent to the Assignment Agreement did

not have the effect of waiving Sections 19 and 34.2 of the Lease.[10] And, of course, significant evidence of that sort was available, so that the waiver issue, had it been pleaded, could have been explored in discovery and at trial.

It is no answer to say, as does RCSH, that TCP had possession of these two documents before the litigation began and thus could have anticipated the defense of waiver. Rule 8(c) imposed on RCSH the obligation to plead the waiver defense so that it could be addressed in discovery and at trial. It is precisely the sort of procedural gamesmanship raised by the circumstances presented here that Rule 8(c) is intended to foreclose. Thus, we find no error in the district court's rejection of RCSH's waiver defense.[11]

---

[10] The district court also held that the two documents (which were not permitted in evidence), along with other testimony would call into play the rule, well-settled under Virginia law, that RCSH was a mere continuation of RC #28 and thus would be liable as a successor under any circumstances. It is unnecessary to address this issue given the fact that RCSH did not plead the affirmative defense of waiver as required by Rule 8(c) and because the district court was clearly correct in finding that TCP was prejudiced by the belated raising of that defense.

[11] On appeal, as it did below, RCSH makes a pass at casting the waiver defense as a question of successor liability. However, given its own pleadings, RCSH cannot be heard to assert that it is not RCSH's successor in interest. Thus, it must stand or fall on the waiver defense.

The district court, alternatively, held: (1) that if the letter and the merger agreement had been admitted, they would defeat the waiver defense on its merits; and (2) that RCSH did not prove waiver by clear and convincing evidence. We need not address either alternative holding.

B.   TCP's Rule 26(a)(1) Disclosure Respecting Damages

In the initial disclosure of its damages made under Rule 26(a)(1), TCP disclosed damages in the amount of $78,346.87. The proof at trial showed damages of $110,372.14 which, of course, was the amount of the judgment.  RCSH argued that TCP should be foreclosed from proving the greater sum because it varied from the amount of damages set out in TCP's initial pretrial disclosure.

The district court rejected that argument, holding that:

> There is no showing on this record of any prejudice that results from the difference . . . .  In fact, as I see the discovery, these documents were made available, and it was gone through in some detail.

(JA 1279).  We review that decision for abuse of discretion.

Although RCSH continues on appeal to assert that there was a difference between the initial disclosure and the sum proved at trial, it does not contend that the district court erred in finding that the greater sum was disclosed in discovery and "gone through in some detail."[12]   The mere fact that the damage claim was increased after the initial disclosure does not operate to foreclose proof of the greater amount where, as the district court held, the greater amount was the subject of discovery.  Indeed, Rule 26(a)(1) contemplates that the initial disclosure will be

---

[12] The higher sum also appeared in TCP's proposed findings of fact and conclusions of law filed on the Friday before trial. That, however, was not a basis for the district court's finding respecting supplemental disclosure on TCP's damages.

23

based on information available at the time of disclosure. And, Rule 26(e) requires that initial disclosures be supplemented. Considering this record, the district court's findings respecting supplemental disclosure, and the provisions of Rule 26(a)(1) and Rule 26(e), we find no abuse of discretion in the district court's decision to allow proof of the larger damage sum.

C. Sufficiency of Proof: Causation

RCSH contends that there was insufficient proof that the breach of the Lease was the proximate cause of the damages claimed by TCP. Findings of proximate cause, usually described as mixed questions of law and fact, are to be reviewed for clear error pursuant to Fed. R. Civ. P. 52(a). Exxon Co., U.S.A. v. Sofec, Inc., 830, 840-41 (1996); Cohen v. Boxberger, 544 F.2d 701, 704 (4th Cir. 1976).[13]

The district court's findings on causation were articulated in great detail (JA 1255-58; 1263-66). Measuring those findings

---

[13] Most of our sister circuits adhere to this rule. Childress & Davis, Federal Standards of Review, § 2.28 (3d ed. 1999); Wright & Miller, Federal Practices and Procedure Civil, § 2589 (1995). One treatise points out that some of our decisions between 1966 and 1983 appear to have departed from it (and employed a freely reviewable standard), Wright & Miller, Federal Practice and Procedure Civil, § 2589 (1995), but that we returned to it in 1983. Id.; Bonds v. Mortensen, 717 F.2d 123, 125 (4th Cir. 1983). Whatever may be said of this history, the Supreme Court, in 1996, seems to have settled the matter in favor of application of the clearly erroneous standard to the review of findings of proximate cause. Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 840-41 (1996) ("issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder subject to limited review.").

against the record as a whole, we find no error in the district court's finding that the breach of the Lease obligation to maintain and repair the drain lines proximately caused the loss for which TCP sought redress in its counterclaim.

D.    Sufficiency of Proof: Damages

There was fulsome proof that the damages were incurred in the amounts claimed and that they were of the sort that were compensable for the breach of the Lease.  The challenge to the sufficiency of the proof made by RCSH is that the witnesses who were offered to prove TCP's damages were not from TCP, but from its property manager.  Thus, says RCSH, there was no proof that TCP actually paid the bills that were admitted to support its damage claim.  The sufficiency of proof of damages is a fact issue which we review for clear error.[14]  Having done that and considering the record as a whole, we are satisfied that the district court did not err in finding that the proof was sufficient to support the award of damages in the amount claimed.

V.

RCSH argues that the district court erred in striking its demand for jury trial.  This issue comes to us as a request to direct a jury trial on remand.  Because of the disposition of the

---

[14] <u>Scott v. Vandiver</u>, 476 F.2d 238 (4th Cir. 1976); Childress & Davis, <u>Federal Standards of Review</u>, § 2.22 (3d ed. 1999).

25

foregoing issues, there will be no remand. And, it is unclear from RCSH's brief whether it even asserts error in the decision to strike the jury demand as to TCP's counterclaim.[15] Assuming, however, that RCSH is pressing that issue, we will address it.

In its complaint, RCSH asked for trial by jury. Neither the answer nor the counterclaim contained any such request nor did the reply to the counterclaim. At the pretrial conference, approximately five weeks before the commencement of trial, the case for set for a jury trial. On July 25, 2002, seven days after the pretrial conference, TCP moved to strike RCSH's jury demand, asserting as the ground therefor, the terms of Section 47 of the Lease which provides that:

> landlord and Tenant hereby expressly waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other, on any matter whatsoever arising out or in any way connected this Lease, their relationship as landlord and Tenant, Tenant's use and occupancy of the Demised Premises and/or any claim of any injury or damage.

The district court held that the waiver of jury trial meant precisely what it said and enforced it. We see no error in that decision.

---

[15] In its opening brief, RCSH states: "[t]hus, on remand, this Court should direct that in at least the further proceedings as to [naming all defendants other than TCP], RCSH is entitled to a jury trial." The issue is not addressed in RCSH's reply brief.

26

VI.

For the foregoing reasons, the judgment of the district court granting summary judgment on the claims of RCSH is affirmed, and the judgment of the district court awarding damages to TCP in the amount of $110,372.14 is affirmed.

<u>AFFIRMED</u>